### SYMMES et al. v. UNION TRUST CO. OF NEW YORK et al.

#### (Circuit Court, D. Nevada. March 5, 1894.)

#### No. 527.

1. CORPORATIONS—TRUSTEES—BREACH OF TRUST—FORECLOSURE OF MORTGAGE —ASSESSMENT OF STOCK.

The failure of the trustees of a corporation to levy an assessment on the stock for the purpose of paying a mortgage, and thereby preventing a foreclosure and reorganization, and a consequent extinguishment of the interest of the nonassenting stockholders, is not such neglect of duty as will enable dissenting stockholders to overturn the reorganization after it is accomplished; it appearing that the shares, on their face, purport to be unassessable, that the trustees are advised by competent attorneys that an assessment would be of doubtful legality, and that, if made, it would work injustice to many stockholders who have previously paid in money under a different plan.

2. SAME—REORGANIZATION—DISSENTING STOCKHOLDERS.

Under equity rule 94, one who purchases shares of stock in a corporation after a plan of reorganization has been adopted and partially carried out is not in a position to maintain a suit to set the same aside on the ground of fraud and neglect of duty by its trustees and other parties.

3. SAME—ESTOPPEL.

Stockholders who have had full knowledge of a plan of reorganization, and have given it their approval, and subscribed to its provisions in respect of part of the stock owned by them, are estopped, after the reorganization is complete, to maintain a suit, as owners of the stock on which they did not subscribe, to overthrow the same on the ground of fraud and conspiracy.

4. SAME—FRAUD—CONSTRUCTIVE TRUSTS.

Acts of the president and trustees of a corporation in promoting a plan of reorganization whereby a hostile foreclosure, which would extinguish the interest of all stockholders, is prevented, and a friendly foreclosure

substituted, which preserves to the subscribing stockholders an interest in the property, are not constructively fraudulent, and give rise to no constructive trust in favor of the old organization, when there is no actual fraudulent intent, and all parties interested are consulted, and all reasonable notice given to the widely-scattered stockholders; and this is true although a large personal profit, in the shape of a contingent fee, accrues to the president of the corporation, who is the principal promoter of the plan of reorganization.

This is a suit in equity, brought by three stockholders of the Sutro Tunnel Company, a California corporation, viz.: Frank J. Symmes, as owner of 5,000 shares of stock; Joseph Aron, as owner of 10,000 shares; and F. H. Wheelan, as the owner of 250 shares, —suing for themselves and other stockholders of said corporation, —against the Union Trust Company, a New York corporation, the Comstock Tunnel Company, a New York corporation; the Sutro Tunnel Company, a California corporation, Theodore Sutro, and 28 other individuals, comprising, respectively, (1) the trustees of the Sutro Tunnel Company; (2) the members of the executive committee of stockholders in New York; (3) the members of the reorganization committee of stockholders in New York; (4) the individuals and firms who signed what is known as the "syndicate agreement."

The bill, among other things, charges fraud, conspiracy, and a violation of trust and confidence upon the part of the officers and trustees of the Sutro Tunnel Company, with other respondents, to defraud said corporation and its stockholders of their legal rights. The pleadings are too lengthy to attempt any detailed statement of the various allegations contained therein. The contest arises out of the transactions carried on by the respondents in their efforts to procure a settlement and adjustment of a foreclosure suit brought by McCalmont Bros. & Co. against the Sutro Tunnel Company, and the final action taken in regard thereto, the precise nature of which will sufficiently appear from the facts hereinafter stated. The general character of the suit will be understood by quoting simply the prayer of the bill, which contains forty specific allegations, and one general averment in the answer.

The prayer of the bill is: "To the end, therefore, that the said defendants may answer (but not under oath, such oath being hereby expressly waived, according to the practice of this court) all and singular the premises, and that a full accounting may be had in equity of all the indebtedness of the said Sutro Tunnel Company, and fully of all receipts and expenditures, debits and credits, which ought in equity to be considered upon such accounting; and that the said Union Trust Company be adjudged by the decree of this court to have procured the legal title to the property of said Sutro Tunnel Company in fraud of the rights of these complainants and of the said Sutro Tunnel Company; and that the conveyance thereof to said Union Trust Company be adjudged to be a cloud upon the title of said Sutro Tunnel Company to its property and franchises, which ought in equity to be removed; and that the said Union Trust Company or the said Comstock Tunnel Company holds the said conveyance and title as the constructive trustee of said Sutro Tunnel Company, and as being in equity a mortgage to secure the payment of the just indebtedness of said Sutro Tunnel Company, to be ascertained upon the said accounting, and to be evidenced by bonds of the said Sutro Tunnel Company, to be issued in accordance with the terms of said agreement of November, 1887; and that these complainants and other stockholders of said Sutro Tunnel Company who have not subscribed to said bonds be adjudged to retain and hold all their rights as stockholders of said Sutro Tunnel Company in the property thereof, subject to the payment of said indebtedness secured by the said mortgage; and that the said Union Trust Company or the said

Comstock Tunnel Company, or either of them, who may hold the legal title to the property of said Sutro Tunnel Company, be decreed to reconvey the same to the Sutro Tunnel Company; and that the trustees of said Sutro Tunnel Company be ordered to issue the bonds of said company and a new mortgage upon its property, as provided by the terms of said agreement of November, 1887; and that if the said Union Trust Company has not conveyed the said property to the said Comstock Tunnel Company, that it be enjoined from so conveying the same pending this suit; and that it be particularly restrained from paying out of the proceeds or income of said Sutro Tunnel property or franchises the sum of $100,000, or any other sum, to Theodore Sutro, or from paying therefrom any part of the sums agreed to be paid by the members of said syndicate, either to themselves or others, as commissions or compensation under the terms of said syndicate agreement; and that said Union Trust Company be further restrained from enforcing its judgment for a deficiency against said Sutro Tunnel Company, or any part thereof; and that your orators may recover their costs herein expended against all of the defendants herein, and may have such further or other relief as the circumstances of this case may require, and as to this honorable court, sitting as a court of equity, shall seem meet and agreeable to equity and good conscience."

The answer of the Union Trust Company and all other respondents served with process, except the Sutro Tunnel Company, contains 75 allegations of admissions and denials, one of which is here quoted: "And, further answering, these defendants deny, and each denies, that the complainants, or any of them, are entitled to any relief whatsoever, in this or any court whatsoever, in the premises, and say: That complainants, and each of them, had full knowledge and notice of all of the transactions in this answer set forth, and of the intention to consummate them at the time and before any of said transactions occurred. That the said complainants, and each of them, had full and ample opportunity to subscribe for the said bonds, and had the same opportunity to subscribe therefor that the stockholders of said Sutro Tunnel Company who did subscribe therefor had; and that neither these complainants, nor any of them, nor any of the stockholders of said Sutro Tunnel Company who did not subscribe to the said bonds, made or attempted to make any objection, or took or attempted to take any exception to any of the acts or transactions herein set forth; and that neither these complainants, nor any of them, nor any of the stockholders of said Sutro Tunnel Company who did not subscribe for the said bonds, ought in equity, or otherwise, now to be permitted to make any objection or to take any exception thereto, or in any way to affect or invalidate the said acts and transactions; and that the said complainants, and each of them, and all of the stockholders of the said Sutro Tunnel Company, whether they subscribed to the said bonds or not, had at all times full and free access to all of the books papers, instruments, and records of said Sutro Tunnel Company, among which were included full minutes of all proceedings of its board of trustees, entered at the time of such proceedings, and the originals or true copies of the said syndicate agreement, and all papers pertaining thereto, filed among said records on or about said August 10, 1888, when said syndicate agreement was approved as aforesaid and showing, in detail, all of the transactions in this answer set forth, in so far as they had any relation to the said Sutro Tunnel Company or its stockholders as such; and that the said trustees of said Sutro Tunnel Company, and the officers thereof, and each of them, and particularly the said Theodore Sutro, and also the members of said executive and reorganization committees, were at all times ready and willing to give to any and all of the stockholders of the said Sutro Tunnel Company any and all information in the premises that they, or any of them, might desire, and did so whenever thereto requested. That all the transactions and acts of the trustees of said Sutro Tunnel Company in this answer set forth were had and done in good faith, and in the exercise of the best judgment and discretion of said trustees and of the officers of said company; and that said acts and transactions were the only feasible and possible means whereby the property of said Sutro Tunnel Company could at all be saved in the interest of any of the stockhold-

ers of said Sutro Tunnel Company whatsoever, and by which the foreclosure in the sole interest of said McCalmont Brothers & Company, which would have resulted in the exclusion of every shareholder of the Sutro Tunnel Company, could be prevented; and that a large majority of the stockholders of said Sutro Tunnel Company having come forward, together with said syndicate, and having, by their own efforts, and with their own funds, purchased the said McCalmont mortgage. it would not be just nor fair nor equitable that the stockholders of said Sutro Tunnel Company who failed or refused to come forward or to join in the said efforts or to advance any part of said money (the many notices, requests, and appeals on the part of said Theodore Sutro and the trustees of said Sutro Tunnel Company and said executive and reorganization committees, extending over a period of more than eighteen months, hereinbefore set forth, to the contrary notwithstanding), should share in the benefits resulting from the purchase of said mortgage and the success of said reorganization."

The Sutro Tunnel Company filed a separate answer by Pelham W. Ames, secretary.

If difficult to make a condensed statement of the pleadings, covering 182 pages of printed matter, within the limits of an ordinary opinion, what shall be said of the facts when the testimony, independent of exhibits of almost equal length, consists of about 6,000 type-written pages and the printed briefs of counsel over 800 pages? The case cannot be thoroughly understood without full knowledge of all the conditions and causes which led to the acts of parties of which complaint is made. The order in which the transactions occurred is important in determining whether the acts were consistent with fair dealing, or whether the transactions which took place, and the conduct of the parties, were fraudulent in fact, or constitute what is known as "constructive fraud." The importance of all the questions involved in the case, and the thoroughness with which they have been argued, demand from the court more than an ordinary statement. A complete statement of the facts is not essential, but a skeleton history, in chronological order, will here be given.

The Sutro Tunnel Company, at the time of the transactions involved in this suit, consisted of 2,000.000 shares of stock of the par value of $10 per share. On the 4th of January, 1877, it executed a mortgage or trust deed upon its property situate in Storey county, Nev., to McCalmont Bros. & Co., of London, England, to secure the payment, on the 1st of January, 1881, of the sum of $124.321.10, for which amount it was then indebted, and for all further advances that might thereafter be made, with interest thereon at 12 per cent. per annum, payable semiannually. Further advances were from time to time made, and on the 28th of March, 1878, the amount due aggregated the sum of $433,965.10. A supplemental agreement was then made, whereby the Sutro Tunnel Company agreed to pay said sum and all further advances that might be made, with interest, on January 1, 1891; the interest to be paid in half-yearly payments, and, if not so paid, the principal and interest to become immediately due. On March 28, 1886, a bill was filed in this court for the foreclosure of said mortgage. A receiver of the mortgaged property was appointed, and the suit was pending until October 1, 1888, when a decree of foreclosure was entered as of August 13, 1888, for $1,420,-209.46, and costs of suit, taxed at $2,075.

At the time of the commencement, and during the pendency, of the suit, it was the general understanding of the stockholders, trustees, officers, and attorneys of the corporation that there was no legal defense that could be interposed to the suit. Many efforts were made to postpone and delay the time of trial, and divers and sundry attempts were unsuccessfully made to procure a compromise, settlement, or amicable adjustment of the suit upon such terms and conditions as would have enabled the corporation to save its property. It is charged in the bill that Theodore Sutro, when president of, and attorney for, the Sutro Tunnel Company, in utter disregard of his duty to the corporation and to its stockholders, entered into an agreement with certain of the other respondents to bring about a sale and transfer of the property of the Sutro Tunnel Company to the Union Trust Company, to be held by it for the benefit of a large number of the stockholders of the Sutro

Tunnel Company and a few outside parties; that this agreement was carried out; that in consideration of such agreement he received a large pecuniary consideration, which he concealed from the trustees and stockholders of the Sutro Tunnel Company.

The alleged fraudulent acts of Sutro constitute the foundation on which this suit is based. It is therefore important to ascertain how he became connected with the transactions, and what he did in relation to the various plans that were devised for the purpose of raising money to meet the demands of the McCalmont mortgage. His first appearance was in consultation as an attorney with respondents Thayer and Baltzer and one other stockholder, who called upon him shortly after the commencement of the foreclosure suit to ascertain if anything could be done to save the property of the corporation. He promised to look into the matter, and in the fall of 1886 informed them that he could not undertake to do anything in the matter without specific authority and a direct understanding as to his compensation. On the 18th of December, 1886, respondents Thayer, Baltzer, Stursberg, Palmer, and Lowengard, and other stockholders, representing 65,360 shares of the Sutro Tunnel Company, united in signing a letter to Mr. Sutro, requesting him to act as their attorney, and, if possible, to obtain an extension of time for them to intervene in the foreclosure suit, agreeing, if he was successful, to pay him a reasonable compensation for his services. An advertisement was thereafter published in seventeen New York, three Boston, two Philadelphia, one Baltimore, and one Chicago daily papers, from the 8th to the 12th of January, 1887, as follows:

"Sutro Tunnel Company. Preparatory steps having been taken towards saving the stock of the Sutro Tunnel Company from extinction by the pending foreclosure proceedings against said company, all those owning or controlling stock therein are invited to attend a meeting to be held at the office of the Farmers' Loan and Trust Co., No. 20 William St., New York City, at 12 o'clock noon on Wednesday, the 12th inst., to devise means for concerted action. A full attendance is of the greatest importance.

"Committee of Stockholders.

"New York, Jan. 8, 1887."

At this meeting, which for convenience, after due notice, was held at Mr. Baltzer's office, a general committee of stockholders, consisting of Baltzer, Thayer, and Lowengard, was appointed, with full power to act, and Theodore Sutro was retained as attorney for the stockholders. A petition for intervention was drawn up, which, in substance, avers that McCalmont Bros. & Co. controlled a majority of the stock of the Sutro Tunnel Company, and elected a majority of the trustees, who are under their control; that said trustees have ostensibly undertaken to defend the foreclosure suit, and have filed an answer consisting only of general denials; that affirmative and meritorious defenses exist in favor of petitioners which have not been set up; that the defense to the suit is not being conducted in good faith; that there is great danger that the rights of petitioners will not be adequately protected or maintained, etc. This petition was signed by stockholders representing 165,000 shares of stock, and was filed in this court on January 31, 1887. Mr. Samuel M. Wilson and respondent Edmund Tauszky were retained with Mr. Sutro, and argued in favor of the intervention on February 10, 1887, and obtained leave of the court to have until March 2d to file their closing briefs. On the 15th of February the board of trustees of the Sutro Tunnel Company met and adopted the following resolutions: "Resolved, that it is the desire and intention of this board to give to the stockholders of this company every facility for defending the action now pending for the foreclosure of the mortgage held by Messrs. McCalmont Bros. & Co., and to that end to consent to the intervention of certain stockholders who have petitioned the court to be allowed to do so, and that the attorney of the corporation be advised of this resolution of this board. Resolved, that a committee of two members of this board, to be appointed by the chair, be authorized and directed to inform the attorneys of the stockholders who have petitioned to be allowed to intervene in said action that the board is willing to assist them in every proper way to present any defense which

they may desire to make to such action." Two days thereafter these resolutions were rescinded, and others adopted, denying that a majority of the board were under the control of the McCalmonts and declaring that the trustees wished to protect the rights of all the stockholders, and authorized the attorney of the corporation to consent to the intervention, and invite the attorneys for the stockholders to assist him in defending the foreclosure suit. On the 24th of February, Sutro left New York, and arrived in San Francisco March 2d. He immediately took active steps in endeavoring to secure sufficient proxies to enable him to control the election of the board of trustees at the annual meeting of the stockholders, to be held March 11th. He met with much difficulty in obtaining the consent of men to serve as trustees, the reason assigned for refusal being that the corporation was wholly insolvent. The annual meeting was adjourned until March 28th. At the adjourned meeting, 1,398,829 shares of stock were represented. Of this number, Mr. Sutro and Mr. Tauszky had proxies for 1,023,734 shares, and Mr. Haven, the attorney for the corporation and for the receiver, had 369,500 shares. Five trustees were elected on the proxies held by Sutro and Tauszky, viz.: Moritz Meyer, Frederick Roedig, M. S. Wilson, David Cahn, and John Landers, and William Johns, the receiver, and Pelham W. Ames, on the proxies controlled by Haven. Certain amendments to the by-laws were proposed and carried. A branch office was established in the city of New York. The offices of assistant secretary and attorney and counselor for the corporation were created, and an order passed for holding monthly meetings of the board of trustees. The following, among other, officers of the corporation were elected at a meeting held March 30th: Moritz Meyer, president; Pelham W. Ames, secretary; H. H. Thayer, assistant secretary, New York; Theodore Sutro, attorney and counselor; Union Trust Company of New York, registrars of stock in New York. Mr. Sutro was present at this meeting, and stated that he did not expect to be fully remunerated at once; that he was willing to accept a contingent fee; that if he should be successful he anticipated a reasonable compensation in the future, but he thought he should be allowed a reasonable sum for expenses. It was then voted that he should have the sum of $1,000, and should receive $400 per month on account from April 1, 1887. The question of his ultimate compensation was discussed by the board, but it was deemed advisable not to make any agreement of record at that time. On the 26th of April a written agreement was entered into by four of the trustees, viz. Meyer, Landers, Wilson, and Roedig, as parties of the first part, and Theodore Sutro, party of the second part, which, after reciting at length the existing condition of the affairs of the Sutro Tunnel Company, contained the following covenants: "First. The said party of the second part hereby promises and agrees to devote all his time, energy, and attention to the interests of said company and of its stockholders, both in his capacity as attorney and counselor of the company and as its general adviser, and also as its agent and representative in endeavoring to secure the said contemplated loan with a view of extricating the company from its present legal complications and financial embarrassment, and for said purposes to spend his time either in New York, California, Nevada, or elsewhere, as circumstances may require. Second. The said parties of the first part hereby promise, agree, and undertake, on behalf of said company, that in case said party of the second part shall be finally successful in settling the said foreclosure suit, or in obtaining a discontinuance thereof, or a final adjudication thereof in favor of said company, the said company shall, by vote of the said parties of the first part as trustees thereof, pay to the said party of the second part, for and as his compensation, a sum of money equivalent to five cents a share on the capital stock of said company, consisting of two million shares, namely, the sum of one hundred thousand dollars, less whatever sum or sums may in the mean time be allowed or paid to said party of the second part on account of his said services. Nothing herein shall be construed so as to make the undersigned individually liable in any respect, the covenants and promises aforesaid being made only in their character as trustees of such company."

The other trustees had full knowledge of this agreement, and each admitted that the amount named was reasonable, but for personal reasons, then satisfactorily explained, declined to sign it. At a meeting of the board held April 27th the trustees ratified the acts of Sutro in employing Messrs. Wilson and Tauszky as attorneys. They also passed the following resolution: "Whereas, this board deems it necessary that this company should take immediate measures to raise a sum of money, not exceeding $2,000,000, in order to place this company upon a sound financial basis, and for the purpose of developing its property and general interests, and as it may be advisable for the company to issue mortgage bonds for said purpose, now, therefore, resolved, that Theodore ' Sutro be appointed the true and lawful attorney in fact for this company, for it, and in its name and stead, to contract for the issuance of coupon or other bonds of said corporation in a sum not exceeding $2,000,000, and at a rate of interest not exceeding six per cent. per annum, to be secured by mortgage upon all its lands and other properties of every kind for a time not exceeding thirty years, and upon such terms and conditions as he shall deem to be for the best interests of the corporation, and to enter into, on behalf of the corporation, and as its act and deed, all agreements and contracts which may be necessary or advisable in the premises,"—and authorize the president and secretary to execute a power of attorney authorizing Sutro to act for the corporation, as requested by Mr. Sutro. Sutro was voted $2,500 to enable him to proceed under the power of attorney. During Sutro's stay in California he was diligent and zealous in his efforts to procure an extension of time to appear and defend the McCalmont suit, and had numerous consultations with opposing counsel on that subject, and discussed the probabilities of finally agreeing upon an amicable settlement of the suit. He also secured the aid of Mr. Ames, the secretary of the corporation, to try and bring about the desired results. Telegrams were sent to parties in New York and London, but all his efforts proved unavailing. On the 21st of March the court denied leave to stockholders to intervene. The case was to be tried April 4th. At that time Mr. Sutro appeared and obtained leave to amend the answer, and an extension of time was given for the taking of additional evidence. An order was also made, by consent, that the receiver should pay to the McCalmonts the amount of money in his hands, less the sum of $25,000, and to pay each month thereafter the net amount of the receipts, without prejudice to the defense in said suit. Continued efforts were made to bring about a settlement. Sutro wrote letters to Alexander & Green, the counsel who had full charge and control of the case for the McCalmonts. These negotiations, letters, and telegrams continued for several months. On July 6, 1887, Mr. Sutro received a reply from Alexander & Green, as follows: "In answer to your letter to us, dated May 21, 1887, we beg to say that the complainants are willing to accept the following proposition made by you on behalf of your client, the Sutro Tunnel Company, the defendant herein, namely: That the tunnel company pay in cash, before the 1st day of January, 1888, the entire amount of the principal of the advances made by the complainants, together with interest thereon from the respective dates of each advance at and after the rate of 6 per cent. until the time of payment, less such sums as have already been paid, or may hereafter be paid, over by the receiver under the order of the court dated April 4, 1887, to the complainants herein; and that the cause shall continue uninterruptedly in its regular order, except that the actual trial of the cause and the issues therein shall not be moved at any term prior to January, 1888; and that if the company shall fail to pay the amount of the principal of the advances of the complainants, with interest at 6 per cent., less any deductions from the amount paid by the receiver, as aforesaid, on or before January 1, 1888, our clients shall be released from their acceptance of the proposition of settlement, and the stipulation signed in this cause shall become immediately null and void; and upon the further understanding that, in case of your failure to carry out the proposed settlement, the rights of the complainants shall not in any way be prejudiced, nor their standing in the litigation in any way affected, by reason of their

having accepted your proposition, or by reason of the signing of the stipulation herein."

The substance of this agreement was telegraphed to the board of trustees on the 13th of July. Several of the trustees and stockholders expressed their approval of the terms. On the 16th of July the executive committee of the stockholders in New York addressed to Theodore Sutro, attorney, etc., the following letter:

"Dear Sir: The stockholders of the Sutro Tunnel Company being anxious to learn the result of your investigations into its property and affairs, and what has been accomplished on their behalf in the pending foreclosure proceedings, and also your opinion as to the best course to be pursued by them, we would respectfully request you to prepare and issue, at your earliest convenience, a detailed report about these matters.

"Yours, truly,                      H. R. Baltzer, Chairman,

"H. H. Thayer, Secy. & Treas.,

"Otto Lowengard,

"Executive Committee of the Stockholders."

In reply Mr. Sutro made a lengthy report, which was published in book form, consisting of 198 pages, containing, in detail, everything he had done, and setting forth in glowing colors the present and prospective value of the property owned by the corporation, and making an appeal to the stockholders to come forward and save the property for their own benefit and advantage by complying with his proposed plan to settle the litigation. The report shows: That the main tunnel was begun October 19, 1869, and had cost, up to the time of its completion, to the Comstock lode on September 1, 1878, in round figures, $3,500,000, and that, with interest added since the beginning of the work and expenses since February, 1882, it was safe to assume that the entire cost of the main and lateral tunnels and other appurtenant property belonging to the company would amount to $10,000,-000. That the main objects of the Sutro tunnel were to drain the mines on the Comstock lode, to give ventilation, to transport ore through it from the mines to the mills (and incidentally to transport waste rock to and beyond the mouth of the tunnel, and to transport men, material, and machinery to and from the mines), and to explore, through a vast network of underground tunnels and drifts, the whole mineral belt from the mouth of the tunnel to and about and beyond the Comstock lode. That the title to this property, its rights and franchises, was derived—First, from the legislature of the state of Nevada. (St. Nev. 1864–65, p. 128); and, second, from the congress of the United States (14 Stat. 242). That the first payment of royalty was made in September, 1879, and that yearly payments have since been made as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| From September, 1879, | to March 1, | 1880 | | | | | $ 35,732 79 |
| " | March 1, | 1880, | " | " | " | 1881 | 45,498 23 |
| " | " | " | 1881, | " | " | " 1882 | 19,177 38 |
| " | " | " | 1882, | " | " | " 1883 | 47,627 84 |
| " | " | " | 1883, | " | " | " 1884 | 71,515 75 |
| " | " | " | 1884, | " | " | " 1885 | 125,622 81 |
| " | " | " | 1885, | " | " | " 1886 | 174,183 11 |
| " | " | " | 1886, | " | " | " 1887 | 254,009 29 |
| Total | | | | | | | $773,367 20 |

The prospective income is estimated at $250,000 per year, and "likely, in the course of time, to approximate two or three times, or even ten times, said sum." The amount of the McCalmont claim for principal, and simple and compound interest, is figured up as making a total of $2,023,833.44, and it is stated that the costs and expenses of the receiver, and of a sale of the property, if decree should be enforced, would bring it up to $2,300,000. The stockholders are informed that by making a cash payment of about $1,000,-000 they can accomplish the extinguishment of this debt. In the appeal to the stockholders, Mr. Sutro, among other things, said: "The best policy, unquestionably, is to settle this litigation upon the basis at which we have

now arrived. Among the plans which have been discussed for the purpose of raising money for such settlement, one was that of levying an assessment. That would be the simplest process, as it would free the company at once from debt. But, aside from other considerations against it, the Sutro Tunnel Company has never, since its existence, levied any assessment, and, in my opinion, it would be fairer not to compel the stockholders to put additional money into this enterprise without some immediate return or ample security. Moreover, I do not consider it advisable to imitate the baneful example of mining companies by establishing a precedent for levying assessments on Sutro Tunnel shares. The best plan, and the most advantageous to the stockholders, would undoubtedly be to give them the opportunity to become the creditors themselves by advancing to the company, in some proportion to the number of shares held by each, a sufficient sum of money, so that the sum total advanced by all the stockholders may be equal to what shall be required, not only for the purpose of settling the mortgage claim in suit, but of developing the company's property and resources to the fullest extent; in return for such advance made by each stockholder, the company to execute an income or other bond equivalent to the amount of each loan." And the report closes with this statement: "We think that we have done our part. The stockholders are now in a position readily to save their property. They, alone, will be to blame, should they fail to do their duty." Two thousand copies of this report were printed, and a copy was sent to every stockholder whose address could be ascertained, and to all the principal bankers, brokers, newspapers, and libraries throughout the principal cities of the United States and Europe. Advertisements were published in seventeen New York, one Chicago, one St. Louis, one Boston, one Philadelphia, and one Baltimore daily papers, requesting stockholders to send in their names to H. H. Thayer, in order that they might obtain a copy of Sutro's exhaustive report. During the summer and fall of 1887, Mr. Sutro carried on a voluminous correspondence with Mr. Ames, the secretary, and other of the trustees and prominent stockholders, as to the best method of raising money. On August 26th, Sutro wrote to Ames that he had commenced negotiations with bankers in New York, "with the idea of possibly forming some kind of a syndicate to assist in placing the loan, and have met with a fair degree of success, although so far no definite result has been reached." He subsequently wrote Mr. Ames that he must consider all letters addressed to him in his official capacity as secretary as intended for the whole board. During the months of September, October, and November, Mr. Sutro interviewed many of the prominent bankers, brokers, stockholders, and merchants in New York, and wrote several letters to others elsewhere, in relation to his plans for obtaining financial assistance, informing all parties that no definite plans had been agreed upon, but that a guaranty syndicate seemed to him to be the most feasible, and kept up his correspondence with the board of trustees, informing it of everything he was doing, and asked for broader powers to be given him, so as to enable him to meet emergencies that might arise. Additional powers were given him by a resolution passed by the board at a special meeting held October 17th. This, however, was not deemed sufficient, and Mr. Thayer, the assistant secretary, sent a telegram to the board that Mr. Sutro should be given the widest latitude and fullest discretion, and that restrictions might cause fatal delay at a critical period, and requested the board to make the fewest possible. This correspondence resulted in the passage of the following resolution by the board on October 20th: "Resolved, that full power and authority be, and is hereby, given to said Theodore Sutro to contract for and on behalf and in the name of this company for the issuance or execution by this company of any form of bonds and security, or either, of whatsoever kind or nature, and in whatever denominations, and in whatsoever amount, not exceeding in the aggregate the sum of three million dollars upon their face, and payable at such time or times that said Sutro may deem advisable or necessary, and to contract for any rate of interest to be paid upon said bonds, security, or loan, not exceeding six (6) per cent. per annum on the face value of such bonds or security, or on the amount of such loan, that to him may appear necessary or advisable, and to enter into and execute, for and on behalf of this company, and in its name, place, and stead, any

and all contracts, agreements, and guaranties for the sale of the bonds of this company, at such price or prices as he may determine upon, and also to enter into and execute any and all other contracts and agreements that he may deem necessary or advisable in the premises." Execution of such power of attorney was authorized and duly executed, and on the same day the board, after reciting the former resolution, "resolved, that it is the sense of this board that said Sutro do not make any contracts for the sale of any bonds to be issued by virtue of said power at a price lower than on the basis of fifty cents on the dollar for four per cent. bonds payable in thirty years."

During this time Sutro continued his correspondence with Ladenberg, Thalman & Co. and other parties, but they all declined to act upon the plans suggested by Mr. Sutro, upon the ground that the risk was too great and the security not good enough. After this, Mr. Sutro formulated a plan calling upon stockholders to advance the money pro rata. Thirty-five stockholders were invited to attend a meeting in New York. Nine attended, and appointed an advisory committee of four members. A general plan was agreed upon, to be perfected by the executive committee. Numerous meetings were held, which finally culminated in the adoption of a circular to the stockholders of the Sutro Tunnel Company, which was promulgated by the executive committee on the 15th of November, 1887, and which, after commending and approving the report of Sutro resolved, among other things: "That the following plan of reorganization, without foreclosure if possible, be, and the same is hereby adopted, viz.: An assessment of 50 cents per share is hereby levied and called for, in return for the payment of which stockholders shall receive first mortgage, thirty-year, nonaccumulative, 4 per cent., income bonds of the Sutro Tunnel Company at the rate of fifty per cent. of their face value, the bonds to be issued in denominations of $1,000 and $500, and fractional scrip to be issued for smaller amounts; principal and semiannual interest to be payable in New York or San Francisco, as may be determined; the authorized issue of these bonds to be $3,000,000, to be secured by a first mortgage on the entire property of the company; the Union Trust Company of New York to act as trustee under the mortgage, but not more of such bonds to be issued at the present time than shall be absolutely necessary for realizing sufficient for settling the pending foreclosure suit and attendant expenses, and satisfying and canceling the existing and only mortgage on the property; the remaining bonds to be kept as a reserve fund, to be sold from time to time, if necessary, upon a unanimous vote of the board of trustees of the Sutro Tunnel Company, and the proceeds used for improving or extending the property in some of the particulars mentioned in the said report of Mr. Sutro to the stockholders, in the event that the surplus of the net income of the Sutro Tunnel Company, after all payments hereinafter mentioned, shall not be sufficient for such improvements or extensions. * * * Resolved, that copies of these resolutions be sent at once by the secretary of this committee to the attorney and to the trustees of the Sutro Tunnel Company for their approval and guidance, as presenting the plan desired by the shareholders."

A circular was prepared by Mr. Sutro, signed, "Sutro Tunnel Co.," and issued at the same time, appealing to stockholders to subscribe liberally for the bonds upon the plan adopted by the executive committee. These documents were extensively circulated among the stockholders. Five hundred copies were sent to Mr. Ames for distribution by the board. On November 22d, Sutro wrote Ames: That there was no time to communicate with the board, and that he therefore consented to the plan explained in the circular. That subscriptions were already coming in. That immediate action was required. That there were no hopes of obtaining any further time from Alexander & Green. That he had made arrangements with the Union Trust Company to handle the bonds on the following terms: "$1 per $1,000 for accepting trust and countersigning bonds, and fee of counsel, not to exceed $50, for examining mortgage, and ⅛ per cent. on amount of subscriptions paid in, as compensation for issuing receipts and applying proceeds. Interest will be allowed on money paid in at 2 per cent. per annum. If an extension of time beyond January 1st, 1888, is granted, the rate of interest is to be that allowed on accounts subject to 5 days' notice. If the plan fails, and the money be re-

turned to subscribers, the trust company will charge no commission and allow no interest." That large shareholders desired him to retain Evarts, Choate & Beaman, as their names as counsel in examining the bonds and mortgage would give confidence to bondholders that their rights would be looked after, as contradistinguished from those of the corporation, and asked that all his acts in the premises be ratified by the board of trustees. Such action was taken by the board, and Sutro was notified thereof by telegram on November 29th, accompanied by a request that subscriptions be also taken in San Francisco. A notice of the plan of November 15th was published in the daily papers hereinbefore mentioned, and one Washington, one Denver, and one London daily paper, and a similar advertisement was published by order of the board in San Francisco and Virginia City daily papers until December 15th. Mr. Sutro was personally very active in endeavoring to get subscribers to this plan; but it soon became evident to him, as well as others, that the necessary amount of money could not possibly be raised by January 1, 1888. Early in December he commenced corresponding with Alexander & Green with a view of obtaining an extension of time. On December 21st they informed him that no further extension could be given. In the mean time, notice was extensively given by publication in the newspapers that the time for receiving subscriptions would be extended until December 29th. The subscriptions and payments, to and including December 31, 1887, were as follows:

| Form. | Face Value. | Annual Subscriptions. | Payments Made. |
|-------|-------------|----------------------|----------------|
| A | $738,601 | $364,300 50 | $78,606 10 |
| B | 72,740 | 36,370 00 | 8,294 00 |
| Total | $801,341 | $400,670 50 | $86,900 10 |

During the year 1887, under the order of this court, the receiver had paid to McCalmont Bros. & Co. a total of $258,000. The net amount required to settle with McCalmonts, January 1, 1888, after deducting possible payments on hand, is figured at $944,569.73. Deducting amount subscribed, $400,670.-50, left a deficiency of $543,899.23. The failure to meet the payment as per previous agreement of settlement released McCalmont Bros. & Co., and they therefore had the right to insist upon a trial of the foreclosure suit. The amount due on the mortgage, January 1, 1888, was $1,438,487.92. Notwithstanding this gloomy financial showing, Mr. Sutro, with unabated zeal, determined to continue his efforts to raise the amount of money necessary to make a settlement, as previously agreed upon, because, as he states, it would be some time before the trial of the suit could be reached, and because Messrs. Alexander & Green had verbally said to him that, if he brought the cash before the day of trial, they might accept it. On January 6, 1888, Mr. Sutro wrote a letter to Messrs. Zadig, Wollberg & Co., stock brokers in San Francisco (by mistake dated January 14, 1888), informing them of the progress made in raising money from the stockholders, stating that sufficient had been subscribed to make about $400,000 in cash; that about $600,000 more was needed,—and, among other things, said: "I have no doubt, also, that all the shareholders will eventually come in and subscribe for the bonds, but the two million shares are literally scattered all over the world, and it would take too long to go ahead on this plan under the existing circumstances. I am therefore now, as in fact I have been for the last six months, at various periods, trying to get up a guaranty syndicate who will guaranty, on certain conditions, that the balance of the bonds will be placed. If I can present such a guaranty, within a reasonable time, to the McCalmonts, I have no doubt that they will give me sufficient time within which to pay over the actual cash on the basis of settlement heretofore arrived at." In this letter Mr. Sutro asked the firm if they would not assist in the formation of such a syndicate. This letter was shown to Mr. Landers, vice president of the Sutro Tunnel Company, and he took a copy thereof on the 14th of January. On January 9th the trustees sent Mr. Sutro the following telegram: "We are dissatisfied with present aspect of affairs, and Mr. Ames leaves for New York in a day or two, in our behalf, to consult with you. Suspend all action until his arrival." Sutro replied: "I am sure that much more important Pelham

W. Ames remain at office of the company, San Fran., Cal., for the time being. What is object,—consultation? Is there anything the matter? Everything possible being done here in full accord with committee. Will telegraph if Pelham W. Ames' presence necessary. I cannot delay negotiations now pending. Wrote yesterday." The chairman of the executive committee added: "Executive committee most decidedly indorses contents foregoing telegram." Then came a reply telegram from Vice President Landers: "Theo. Sutro must comply with instructions of board of trustees of the Sutro Tunnel Co. by telegraph, and negotiations must be delayed temporarily, Pelham W. Ames leaves tomorrow."

Telegrams came, and answers went, thick and fast, and the contents of some were considered as a deathblow to any further subscriptions. Confusion reigned supreme, the price of the shares of stock decreased, and great dissatisfaction existed among the stockholders. There was great danger of an open rupture, which would result disastrously to all concerned. Ames arrived in New York, and at once proposed to take matters into his own hands, and make a proposition to the McCalmonts through Kidder, Peabody & Co. Sutro expressed his displeasure at this unjustifiable interference with his plans. Finally they mutually agreed upon a course of action which resulted in Sutro making a proposition to Alexander & Green that was signed and approved by Ames, which, if carried out, would extend the time of payment until January 1, 1891. This proposition was immediately rejected. Mr. Ames' efforts met with failure, and he thereupon sent a telegram to the vice president that "Sutro and committee are doing as much as possible to raise money. Think I cannot disturb them unless I can devise another plan. I cannot devise any." Notwithstanding this candid statement, the board advised him to make another effort, which he did, and telegraphed results as follows: "Kidder, Peabody & Co. say they will not entertain any proposition unless made by Theodore Sutro, as attorney for the company, and in writing." The next day he reiterates his former statements that Sutro and the committee are doing their best; that "their idea is to substitute a friendly, instead of a hostile, plaintiff foreclosure suit;" and he adds that he "can do nothing except through Sutro, as he is the attorney of record." He also advised that certain sums of money be remitted to Sutro without delay. On February 6th, the sum of $2,500, previously asked for by Mr. Ames, was sent to Sutro by the trustees. Ames returned from New York with resolutions of the committee of stockholders requesting the withdrawal of the suspension of Sutro's powers, and, after he had fully explained the condition of affairs as he found them, the board, on February 15th, passed a resolution withdrawing the telegram suspending further action upon the part of Sutro. In the meantime, McCalmont Bros. & Co. had served notice that on February 20th they would move the court to fix a day for the trial of the foreclosure suit. On February 15th, Sutro issued and distributed a circular to the stockholders, notifying them of this action upon the part of the McCalmonts, and setting forth the danger of extinction of the stock unless immediate steps were taken, and the required subscriptions at once raised. Among other things he said: "Are the stockholders willing to lose the opportunity of protecting, for one million dollars, a property which has cost ten millions, and has now an income of about one thousand dollars per day, when they can save it, and impart a substantial value to their shares, by loaning their own company 50 cents per share, and receiving in return first mortgage security on this valuable property at the rate of $1 per share?" The next day he wrote to Alexander & Green, requesting an extension of time, which was promptly refused. On February 20th the foreclosure suit was set for trial on March 27th, and thereafter was by the court continued until May 8th, to be heard before Judges Sawyer and Sabin in San Francisco. On February 25th, the board learning that Vice President Landers was about to visit New York, passed a resolution "that Messrs. Landers and Sutro consult with each other with a view to extricate the corporation from its present embarrassments." Shortly after the arrival of Mr. Landers in New York, difficulties sprung up between him and Sutro, Sutro claiming that Landers was seriously interfering with his plans, and he vigorously protested against the action taken by Landers. In a let-

ter written to Landers March 13th, Sutro said: "I therefore desire herewith to enter my written protest against either you, or any one else, through, ·with or for you, interfering in the work devolving, as aforesaid, solely upon me. If you, either as a shareholder or trustee of the company, desire to make any suggestions to me in regard to what individuals to see, or what plans to adopt, I will be happy to hear such suggestions, but I protest against your doing anything in the premises without my previous concurrence. As the agreement for my ultimate compensation was made conditional upon noninterference with my work as well as upon eventual success, and as I have discharged my part of the agreement to the utmost extent up to the present time, and shall so continue hereafter, I shall treat any interference as a condition broken; and I hereby notify you that, in case of failure in what I have undertaken to complete, I shall hold you and everyone so interfering, as aforesaid, personally responsible for damages,—on my own behalf to the extent of the compensation of which I originally entered upon my labors, and on behalf of the stockholders of the company whom I represent for the full loss accruing to them. * * * The various negotiations, transactions, and steps which are requisite for a successful discharge of my duties must necessarily be, to a large extent, confidential, and not open to general discussion, and in fact many of them are under the seal of secrecy. The whole work upon which I have entered is one of extreme difficulty and delicacy, and can only be successfully performed by one person, and only if that person be neither worried nor annoyed, nor his time taken up with counteracting cross purposes and interferences, emanating from his own clients or of their said trustees." On February 28th, Sutro wrote Ames, among other things: "So much, however, has been stirred up since January 1st, against my strong protest, tending to show the probability that foreclosure cannot conveniently take place in the interest of such shareholders as have subscribed or will subscribe, that it is almost impossible now to devise any means by which to influence further subscriptions; and if the Sutro Tunnel Co. goes to the wall, and every share of stock is wiped out in the interest of the McCalmonts, I, for one, shall wash my hands of all responsibility. I am now driven in the very direction which I, myself, most of all desire to avert, but which the interferences in my plans have forced upon me as a last resort, namely, to still struggle to get together some kind of a syndicate. But even that last hope is now much less likely of meeting with success than it would have been had I not been compelled to lose so much valuable time since January 1st." During the months of January, February, and April, 1888, Mr. Sutro interviewed a number of bankers, the mine owners upon the Comstock, and millionaires throughout the country, with a view of obtaining financial help, but only succeeded in getting the consent of Seligman & Co., of New York, to consider the matter. S. M. Wilson was in New York in April. Sutro fully explained to him the situation of affairs. Mr. Wilson gave it as his opinion that the McCalmont claim could not possibly be defeated; that no longer extension of time was likely to be granted; and that, as an attorney for the Sutro Tunnel Company, he advised continued efforts to have the transfer of the mortgage made from a hostile plaintiff to a party who would protect the interest of the stockholders.

On March 5th, Mr. Sutro made another proposition to Alexander & Green, in which he recites at great length the condition of affairs, and outlined a new plan of issuing bonds. In due time the answer came that his proposed plan could not be entertained. His suggestions were not agreed to, but he was informed that if he was able to pay $250,000 in cash, and give a sufficient guaranty that the balance would be paid on or before January 1, 1889, it would be submitted, and might have a favorable consideration from the McCalmonts. On April 27th, the executive committee held a meeting, and passed certain resolutions declaring that it had been utterly impossible to obtain the necessary funds to settle the foreclosure suit, or to form a syndicate guarantying or advancing sufficient funds until the present time; that it is believed that a settlement may be effected if the money can be raised before foreclosure; that the final hearing of the suit has been peremptorily set down for May 8th, and that no further postponement thereof can be obtained,—and ordered notice to be given as follows: "To Subscribing Stock-

holders of the Sutro Tunnel Company: Pursuant to our notice of January 12, 1888, the balance of your subscription is hereby called to be paid to the Union Trust Company, No. 73 Broadway, New York, between May 2d and May 5th next, inclusive, and you are requested to deposit your stock with said trust company, together with your temporary receipt. By such payment and deposit you will be considered as assenting to the plan of reorganization described in circulars of November 15, 1887, and April 27, 1888, which latter circular may be had by applying to room No. 123, New York Produce Exchange. Subscriptions at the rate of fifty cents are now closed." This notice was extensively advertised in various daily newspapers. The circular referred to in the notice set forth the condition of affairs, stated what would be done when the syndicate was formed, requested further subscriptions, and closed with the statement that "a compliance with the terms of this circular will be regarded as your assent to the reorganization plan, with foreclosure if necessary, and also to all the other terms of this circular, and of the circular of November 15, 1887." This circular, with a form of authorization to the Union Trust Company changing their subscriptions, was sent to every subscribing stockholder. It does not affirmatively appear that any of the circulars were sent to the trustees in their official capacity, or that any communication was sent to them by Mr. Sutro in regard thereto. It does, however, appear that their term of office was soon to expire. The annual meeting of stockholders for the election of a board of trustees was held May 3d. Prior to that meeting, Mr. Sutro, in connection with the committee of stockholders in New York, secured sufficient proxies to control the election, and he decided to make a radical change in the board. At the meeting there were stockholders personally present representing 35,973 shares. Mr. Lilienthal held the Sutro proxies, representing 1,117,889 shares, and Mr. Landers had proxies for 26,210 shares. The following trustees were elected, viz.: Theodore Sutro, Horace H. Thayer, P. N. Lilienthal, George E. Butler, Milton B. Clapp, Frederick A. Benjamin, and Edmund Tauszky. Theodore Sutro was elected president and attorney and counselor, Pelham W. Ames was reëlected secretary. On May 7th the executive committee held a meeting, and prepared and adopted the following letter to Theodore Sutro: "Dear Sir: The understanding on the part of our committee of the terms upon which you undertook to defend the rights of the Sutro Tunnel stockholders in the pending foreclosure suit threatening their existence as such was that you were to receive a fee contingent upon your final success. Before you left New York for San Francisco, in February, 1887, we understood that the amount of said fee was to be one hundred thousand dollars ($100,000), and was not to be dependent in any way upon your securing a reduction of the claim of the McCalmont mortgage or of your raising funds to satisfy said claim, but was based simply upon the condition precedent of your final success in preventing the foreclosure of said mortgage by and in the interest of the present mortgagees, and which would result in the exclusion of all the stockholders of the Sutro Tunnel Company. In presenting you this written statement of the understanding between us we desire to take the opportunity to place upon record, as well as to convey to you, an expression of our estimate and appreciation of your services in behalf of your clients, the stockholders whom we represent. We feel that these services have been arduous, exceptional, extraordinary, and distinguished, combining at once, as they have, services legal, literary, financial, and practical, requiring abilities of a superior order. Since the time when you were with difficulty persuaded to take general charge of the interests of the stockholders of the Sutro Tunnel Company and their rights in the foreclosure proceedings,—almost a year and a half ago,—you have given thereto incessant thought, untiring industry, and energy, unwavering fidelity and devotion, and a fertility of resource which have brought new life and bright prospects to financial interests which were almost universally looked upon as beyond all hope of redemption. In view of the magnitude of these interests and of the results obtained, the obligation of your clients to you can hardly, in our opinion, be estimated at its true value." The executive committee also agreed to pay Seligman & Seligman, attorneys, the sum of $25,000 as a contingent fee for their services in relation to the syndicate. On May

8th, at a meeting of the executive committee, Messrs. Baltzer and Lowengard were nominated and appointed as the two members of this committee to serve, in accordance with the terms of the syndicate agreement, upon the reorganization committee provided for in said agreement. When the foreclosure suit was called for hearing, May 8th, after some discussion between counsel, it was mutually agreed to submit the case on briefs; the complainants to have 30 days to present the opening, the respondents to have 30 days to reply, and complainants 30 days thereafter to file closing brief. The order was so made. The syndicate agreement, which was signed and executed on June 12, 1888, reads as follows:

"Whereas, there is now pending against the Sutro Tunnel Company, a corporation organized under the laws of the state of California, a certain suit in equity in the United States circuit court for the district of Nevada. brought by McCalmont Bros. & Co., of London, to foreclose a certain mortgage upon the property of said corporation; and whereas, a certain agreement of settlement arrived at before January 1, 1888, whereby, before said date, the said mortgage claim could be settled upon payment by the said Sutro Tunnel Company to the said McCalmont Bros. & Co. of a certain sum in cash, the terms of said agreement being contained in certain letters, copies of which are set forth on pages 144 to 151, and 158 to 163, of a certain printed report by Theodore Sutro to the stockholders, which report is dated July, 1887; and whereas, said McCalmont Bros. & Co., the complainants in said suit, have, notwithstanding the expiration of said limit of time for making the aforesaid settlement, expressed their willingness to accept the same basis of settlement of their claim, and have, upon the application of the parties hereto, and in consideration of immediate cash payment, agreed to sell, assign, and transfer their said mortgage for a still lower sum than that arrived at in the aforesaid proposed settlement; and whereas, the said foreclosure suit is now about to be finally submitted for the decision of the court, and may result in a decree in favor of said complainants at an early day; and whereas, the Sutro Tunnel Company has heretofore, in conjunction with a committee of stockholders called 'executive committee' endeavored to raise the necessary sum to settle said mortgage claim, on the aforesaid basis of settlement arrived at before January last, by offering its certain bonds to its stockholders, as more fully set forth in the printed circular hereunto annexed, marked 'Schedule A,' but has failed to raise the required sum, owing to the fact that the greater part of its shareholders have not subscribed for said bonds on said plan; and whereas, about $450,000 cash have heretofore been subscribed for, and twenty per cent. thereof paid at the Union Trust Company of New York, on the plan set forth in said printed circular, A, hereunto annexed, and of said sum over $400,000 paid in full on the modified plan set forth in the printed circular hereunto annexed, marked 'Schedule B,' and it is believed that all of said subscriptions will shortly be made good, and the balance thereof paid in on said modified plan: Now, therefore, we, the undersigned, hereinafter called the syndicate, do hereby, each for himself, and not one for the other, covenant and agree to and with each other, and to and with Herman R. Baltzer, Otto Lowengard, Theodore Seligman, P. C. A. M. Van Weel, and Gordon MacDonald, hereinafter called the 'reorganization committee,' that we, the undersigned, do hereby form and constitute ourselves a syndicate, and do hereby guaranty payment for the bonds hereinafter mentioned to the Union Trust Company of New York, at the rate of fifty per cent. of their face value, and to the extent of the several sums set opposite our respective signatures, for the uses and purposes, and. upon the terms and conditions, hereinafter set forth, namely: First. The members of the syndicate shall not be bound to their subscriptions hereto unless the Sutro Tunnel Company shall agree to do all acts, and execute all instruments, necessary and proper to the complete carrying out on its part of this agreement, nor unless the sum total of such subscriptions hereto shall amount to the sum of $550,000, nor unless said McCalmont Bros. & Co., the complainants in said foreclosure suit, will, upon payment to them in cash of the balance due them upon the said reduced basis of settlement hereinbefore mentioned, assign and transfer the mortgage and deed of trust and cause or causes of action for which the said foreclosure suit is brought, and

all other claims, demands, or causes of action, contracts, agreements, stipulations, or other obligations, if any, in their favor, against the Sutro Tunnel Company in any wise connected with said mortgage and deed of trust or said foreclosure suit to the said reorganization committee, or to such person or persons as may be appointed by said committee, to be held by said committee or its appointee for the uses and purposes and trusts hereinafter set forth; said committee or its appointee to be substituted as complainant in the pending foreclosure suit. Second. An opportunity shall at the earliest convenient date, upon proper notices, be given to the shareholders of the Sutro Tunnel Company who have not yet assented to the plans of reorganization set forth herein, and in the said annexed circulars, to assent, and pay to the Union Trust Company, in trust, an assessment at the rate of 55 cents per share; the number of said notices, and the limit of time stated in each notice, to be in the discretion of the reorganization committee: provided, however, the opportunity thus to be given to shareholders shall not absolutely cease until the expiration of not less than thirty days after the first publication of the first of said notices. Should the reorganization committee, upon the expiration of said period, grant further opportunities to shareholders to assent, it may, in its discretion, advance the rate of the assessment. It is understood and agreed that in the event of any of the present subscribing shareholders not assenting also to the plan of reorganization as herein and in annexed circular B set forth, or in the event of their assenting thereto and not paying in full the respective amounts heretofore subscribed by them, then the syndicate shall have the first option of purchasing at 50 per cent. of their face value, the bonds not paid for by said shareholders. Each assenting shareholder shall, upon payment of his assessment, present his certificate of stock to the Union Trust Co. for deposit, and shall be entitled to receive proper certificates or receipts therefor. Third. In case said assessment shall be paid upon all shares of stock of the Sutro Tunnel Co. by shareholders, or upon a sufficient number of shares, so that the syndicate shall, in their opinion, be sufficiently reimbursed for, and relieved of, their said guaranty, then said mortgage so to be assigned by said McCalmont Bros. & Co. shall be satisfied and discharged of record, and the foreclosure proceedings against the Sutro Tunnel Company under the said McCalmont mortgage shall be discontinued; and in that case the reorganization of the Sutro Tunnel Company shall be completed substantially on the plan set forth in the annexed circular marked 'A,' and in that event the syndicate shall receive from the Sutro Tunnel Company, in consideration of the aforesaid guaranty, and the aforesaid further reduction obtained from McCalmont Bros. & Co. for immediate cash payment, by way of commission, fifty thousand ($50,000) dollars cash, and income bonds, of the description contained in said annexed circular A, to the amount of 200,000 dollars face value. The 5 or more cents which, as aforesaid, shall be paid in by assenting shareholders, over and above 50 cents per share, shall be applied on account of said commission to the syndicate, said cash to be deemed equivalent to double its amount in bonds; and the shareholders of the Sutro Tunnel Company shall receive similar bonds at the rate of one dollar face value for every 50 or more cents per share paid in, as the case may be. Fourth. In case said assessments shall not be paid upon all shares of stock of the Sutro Tunnel Company, or shall not be paid upon a sufficient number of shares, so that the syndicate shall, in their opinion, not be sufficiently reimbursed for, and relieved of, their said guaranty, then the said person or persons to whom said McCalmont Bros. & Co. shall assign their said claim in trust as aforesaid shall, upon the request of the reorganization committee, proceed with the foreclosure of said mortgage so to be assigned, sold, and transferred in trust; and in case of a decree against, and sale of. the property of the Sutro Tunnel Company, and if no competition shall arise at said foreclosure sale, said property shall be bid in by the reorganization committee for as low a sum as practicable for the benefit of the syndicate and such shareholders as shall have paid the aforesaid assessments. Thereupon a new company, with the same number of shares as the present company, shall be formed, and shares of stock and bonds of the same description contained in said annexed circular marked 'A' shall be issued in such new company, and distributed as follows: To each shareholder who shall have assented by paying in said assess-

ment (50 or more cents per share, as the case may be) there shall be issued the same number of shares as those on which he shall have assented as aforesaid, and also income bonds of the description contained in annexed circular, A, at the rate of $1 face value for every such share of assenting stock. To the syndicate there shall be issued the same number of shares as the number of nonassenting shares, and also income bonds, of the aforesaid description, sufficient to represent the said nonassenting shares at the rate of $1 face value for every such share of nonassenting stock; and the syndicate shall also receive, by way of commission for the guaranty herein made, and for the other considerations heretofore mentioned, the following, namely: Fifty thousand dollars cash, and income bonds of the aforesaid description of a face value of 200,000 dollars; the 5 or more cents which, as aforesaid, shall be paid in by assenting shareholders, over and above 50 cents per share, shall be applied on account of said commission to the syndicate, said cash to be deemed equivalent to double its amount in bonds. Fifth. In case competition in bidding should arise at said foreclosure sale, the reorganization committee shall, if necessary, bid as high for the property of the company as the full amount of any decree which may be obtained, with the addition of all taxable costs and disbursements, or may bid such higher figure as said committee may hereafter determine. But if the property shall be bid in by other parties, so that a reorganization of the company should become impossible, then the sum realized from said sale shall be applied in the first instance to paying all legal and other attendant expenses and disbursements of the litigation and foreclosure, and of the proposed reorganization hereinafter mentioned in article 7th, and to paying the aforesaid cash and bond commission to the syndicate, the bonds to be paid for at the rate of 50 per cent. of their face value. The balance realized from said foreclosure sale shall be applied to the satisfaction of the decree, for its full amount, for the sole benefit of the syndicate and of assenting shareholders, in proportion to the number of bonds of the two million dollar issue to which they severally would have been entitled had the reorganization plan herein set forth been fully carried out; and after such payments, as aforesaid, the balance, if any, of the proceeds of said foreclosure sale, shall be distributed among all the shareholders of the Sutro Tunnel Company in proportion to the number of shares held by each. Sixth. In case subscriptions heretofore received from income bonds of the foregoing description from nonshareholders of the Sutro Tunnel Company shall be accepted under the plan set forth in annexed circular A, then bonds for such subscriptions by nonshareholders shall be issued out of the said bond commission by the syndicate, at the rate of 50 per cent. of the face value of said bonds. Seventh. It is understood and agreed that the moneys which, under this agreement, shall be paid to the Union Trust Company by the syndicate and by subscribers to the said bonds, shall be applied towards obtaining an assignment and transfer from said McCalmont Bros. & Co., for the purposes hereinbefore mentioned, of the mortgage held by them and now in suit, and that any surplus cash remaining in the hands of the reorganization committee after such payment to said McCalmont Bros. & Co. of the requisite sum, and after buying the property at foreclosure sale, in case that should become necessary or advisable, shall be applied in equal proportions to the following payments, namely: Towards paying to Theodore Sutro the sum mentioned in a certain letter addressed to him by the present executive committee of the stockholders, dated the 7th day of May, 1888, and, as appears from said letter, heretofore agreed upon as a contingent fee to be paid him as compensation for his services on behalf of the shareholders of the Sutro Tunnel Company, as chief counsel, manager, and promoter, in saving the company's property from foreclosure and sale by and in the interest of the present complainants, and which would result in the exclusion of all the shareholders of the Sutro Tunnel Company, and towards paying to Seligman & Seligman, of the city of New York, as a contingent fee, the sum mentioned and agreed upon in a certain letter addressed to them by said executive committee, dated the 7th day of May, 1888, for their services in promoting and organizing a syndicate, and their services in connection therewith, and towards paying the remaining legal and other expenses of the litigation, and of the proposed reorganization of the Sutro Tunnel Company, including the cash commission to the syndicate, and the

compensation to the executive and reorganization committees mentioned in certain letters dated the 12th day of June, 1888, addressed by said committees to the Sutro Tunnel Company. The balance, if any, of said fees and other attendant expenses and commissions shall be paid by the present company, or by such company as may be formed after foreclosure, in equal proportions, in cash, out of the first net earnings, after having set aside the necessary sum for paying the next due interest coupon on its bonds. Eighth. The aforesaid reorganization committee shall consist of five members, namely, Herman R. Baltzer and Otto Lowengard, who have been chosen by the aforesaid executive committee of shareholders, and Theodore Seligman, P. C. A. M. Van Weel, and Gordon MacDonald, who have been chosen by the syndicate. Said reorganization committee shall represent the assenting shareholders and the syndicate as attorneys in fact, to sign all agreements and instruments necessary and proper to be executed in the premises, to issue all notices of the foregoing plan, and otherwise to act for and on behalf of the assenting shareholders and of the syndicate in all matters necessary and proper to be done under the terms of this agreement. Said reorganization committee shall have general charge and discretion, on behalf of the syndicate and assenting shareholders, in regard to all matters connected with the proposed reorganization, and shall act upon a vote of the majority of all its members. In case of the resignation, death, or permanent incapacity of any member of said reorganization committee, the place of such member, if one of the two appointed by said executive committee, shall be filled by said executive committee, and, if one of the three members appointed by the syndicate, shall be filled by the syndicate. Ninth. As soon as the aggregate of the several sums subscribed hereto shall amount to $550,000, the members of the syndicate shall pay the amount of their several subscriptions in cash, as required, and called by the reorganization committee. In case the full amount of the guaranty hereby made, or any part thereof, shall be made good through cash payments by shareholders of the Sutro Tunnel Company, on the plan of the said assessments, as hereinbefore provided, or through bond subscriptions and cash payments by others, then said cash, as soon as received, shall be returned to the several members of the syndicate. Tenth. Interest at the rate of six per cent. per annum shall be allowed on all sums paid in cash by the syndicate from the date of payment until said cash shall be returned to the syndicate, or interest shall begin to run on the new bonds delivered to it. Eleventh. The net profit in cash or securities, or both, resulting to the syndicate in the premises, shall be divided among the members thereof in proportion to their respective subscriptions hereto. Twelfth. Any of the matters hereinbefore mentioned as to be decided by the syndicate, as such, shall be decided by a vote of a majority in interest of all the members of the syndicate. In witness whereof the members of the syndicate and of the reorganization committee have hereunto set their hands and seals, and the members of the syndicate the amount of their respective subscriptions opposite their several signatures, at the city of New York, the 12th day of June, 1888.

|  | Amount cash. |
|---|---|
| "J. & W. Seligman & Co | $135,000 |
| "Robert Fleming (Dundee, by J. and W. Seligman & Co., Attorneys) | 105,000 |
| "P. C. A. M. Van Weel | 100,000 |
| "Geo. W. Stern | 110,000 |
| "H. Stursberg | 25,000 |
| "Ladenberg, Thalman & Co | 25,000 |
| "H. P. Goldschmidt & Co | 15,000 |
| "Maitland Phelps | 10,000 |
| "E. W. Clark & Co | 10,000 |
| "J. & W. Seligman & Co | 15,000 |

"H. R. Baltzer.
"Otto Lowengard.
"Theodore Seligman.
"P. C. A. M. Van Weel.
"Gordon MacDonald.

"We, the executive committee of the shareholders of the Sutro Tunnel Company, for ourselves and such stockholders as we represent, hereby assent to all the terms and conditions of the foregoing syndicate agreement. "New York, June 12, 1888.      H. R. Baltzer, Chairman.

"Otto Lowengard.

"H. H. Thayer, Secretary and Treasurer."

On the same day (June 12th) the executive committee met and approved the syndicate agreement. The members of the committee also agreed to accept, for their agreed compensation of $15,000, the sum of $5,000 in cash, and for the balance to purchase certificates issued by the Union Trust Company at the price of 65 cents. The members of the reorganization committee, Seligman & Seligman, and Sutro, attorneys, agreed to similar terms; and with reference to Mr. Sutro it was agreed, in consideration of such change in his compensation, that he should be "retained as president of such new company at a monthly salary of not less than five hundred dollars." These propositions were agreed to by Mr. Sutro, "without prejudice, however, to any rights or defenses of the Sutro Tunnel Company in the pending foreclosure suit against it." The facts are that Mr. Sutro received in cash the sum of $40,000; he received bonds at $92,000, face value, at 50 per cent., $46,000; he received 92,000 shares of stock at 15 cents per share, $13,800; and a further cash payment of $200,—making a total of $100,000. On the 21st of June, the syndicate paid to the Union Trust Company the sum of $550,000. The amount previously paid in by the subscribing stockholders was $397,890.50, making a total in the hands of the Union Trust Company of $947,890.50. The Union Trust Company on the same day (June 21st) paid to the representatives of McCalmont Bros. & Co. the sum of $800,000, and the mortgage was thereupon assigned and transferred to the Union Trust Company, which then had a balance on hand of $147,890.50, which was transferred to the credit of the reorganization committee. It should be stated in this connection that the payments made by the receiver had reduced the amount due the McCalmonts in their offer of settlement to the sum of $800,000, and that that sum was the amount due, independent of all sums of money paid by the receiver. On June 22d, Mr. Peckham, of counsel for the Union Trust Company, notified the trustees of the assignment of the mortgage. On July 12th, Mr. Sutro arrived in San Francisco. On July 14th, the Union Trust Company was substituted, in place of McCalmont Bros. & Co., as complainant in the foreclosure suit. The time for the Sutro Tunnel Company to file its brief had been previously extended until July 23d. On July 21st, Mr. Sutro telegraphed to Mr. Seligman, attorney for the reorganization committee, for further time, and received a telegram in reply: "Time file brief extended 30th; time stockholders subscribe present price will not be extended unless company allows decree full amount claimed be entered without delay." Mr. Sutro testified that he was in San Francisco from July 12th to October 18th, and during that time the matter of the approval of the syndicate agreement and consent to a decree in the foreclosure suit "were fully discussed and considered at great length, and almost daily, from the time of my arrival in San Francisco until these events of the approval of the syndicate agreement and the consent to the entry of the decree actually took place, both at interviews with Mr. S. M. Wilson, Mr. Edmund Tauszky, and also especially with a Mr. Jarboe, of Messrs. Jarboe, Harrison & Goodfellow, a firm of attorneys in San Francisco, and also with Mr. Philip N. Lilienthal, the vice president of the company, and also with other members of the board, and were also fully discussed and considered at meetings of the board of trustees (the dates of which appear in the records of the company prior to the taking place of these events of the approval of the syndicate agreement and consent to the decree. The discussions and consideration of these matters between Messrs. Jarboe, Lilienthal, and myself were very long, and the matters considered from every point of view, in so far as the interests of the Sutro Tunnel Company were concerned. More especially were, in these discussions, the interests and rights of the stockholders considered who had not, as yet, contributed their proportion to the sum required of them under the subscription plan. I may

say, in general, in answer to this question, that these various matters about which I have spoken were most carefully and elaborately considered and discussed, and constantly kept in view, at every interview and at every meeting of the board at which I was present at that period. I may say that the one point was always uppermost in these discussions, namely, what, under the circumstances, the board of trustees had best do to give a further chance to the Sutro Tunnel Company, and all its stockholders, to retain their property." Upon cross-examination, when questioned with reference to the employment of Mr. Jarboe, he testified: "I found, after talking to Mr. Lilienthal, that he was a man of exceptionally strong character and independent views, and he told me that he would only do what he thought was absolutely right and proper, and from every point of view, legal and otherwise, for the utmost interest of the Sutro Tunnel Company, and that he did not care whether J. & W. Seligman & Co. or any other people had gone into the syndicate; that he was a trustee of the Sutro Tunnel Company, and vice president of the company, and he would not, under any circumstances, consent to any such action unless he, at all events, was convinced, after the most careful consultation with his own counsel, and wholly independent of the counsel for the Sutro Tunnel Company, that it would be proper for him, after such advice, and in pursuance of such advice, to consent to the entry of a decree or to the approval of any syndicate agreement, or to any of the measures which came up in the course of my discussions with him after my arrival in San Francisco. I told him that I did not think it was necessary to enlist the services of Mr. Jarboe, because I took exactly the same position which he did, and would under no circumstances ask him or advise him or any one to do anything which I was not absolutely and bona fide convinced was for the absolute good, and the only hope and chance, for the Sutro Tunnel Company or its stockholders to retain the property; but that, as a matter of course, I did not stand in the way of getting all possible light on the subject, and that, if he wanted to retain Mr. Jarboe, or any attorney in San Francisco, I would be only too glad to advise with him further, or to have him advise with him independently of myself, and as often, and to any extent, that he might see fit; and in that way Mr. Jarboe was consulted about the matter by Mr. Lilienthal." The board of trustees of the Sutro Tunnel Company held meetings every day from August 6th to 10th, both days inclusive. At the meeting on the 6th, Mr. Sutro was present, and made a report, as attorney for the company, as to the status of the foreclosure suit, and among other correspondence between Mr. Sutro and Messrs. Haggin & Dibble, of counsel for complainants in the foreclosure suit, presented the following letters, viz.: First, a letter from Sutro, dated August 2d, as follows: "In answer to your favor of this morning, I desire to make the following proposition of settlement herein, subject to ratification and confirmation by the board of trustees of the Sutro Tunnel Company, and without prejudice to the rights of the defendant, should this proposition not be accepted, viz.: That the defendant consent to the entry of a decree in favor of complainants, pursuant to the terms of the mortgage in suit, on the following conditions: First, that the complainant waive all demands for interest upon interest; second, that all moneys heretofore paid by the defendant, whether on account of interest upon interest or otherwise, and also all moneys paid by the receiver herein under the order of court, up to the entry of the decree, be credited to the defendant; third, that if the defendant shall pay to the complainant, within ninety days after entry of the decree, the amount paid to the former complainants for the mortgage in suit, with the addition of such interest on said amount, attendant expenses and commissions, as may be approved by the board of trustees of the defendant, the judgment shall be satisfied of record, and, if the property of the defendant shall have been sold within said period, and shall have been bid in by the complainant, said complainant shall reconvey the same to the defendant upon like payment by the defendant; fourth, that within said period of ninety days there be given to such stockholders as have not yet subscribed for the bonds of the Sutro Tunnel Company, heretofore authorized to be issued, an opportunity to do so upon due notice, in order to raise the money with which to make the aforesaid payment, and that payment by means

of said subscriptions to said bonds shall be deemed payment by the defendant." To which Messrs. Haggin & Dibble replied, on August 4th, as follows: "We have this day (at 3:45 p. m.) received the following telegram from Wheeler H. Peckham, Esq., counsel for the Union Trust Co.: 'Sutro's offer declined. If company consent to decree with compound interest, complainant will credit all money heretofore paid by company or receiver; will accept face of decree with interest within ninety days before [from] entry of decree, without the eighteen per cent. penalty; will give stockholders ninety days' further time to assent at slightly higher rate. If this offer is not forthwith accepted, stockholders will not be given further right to assent, or, if given, it will be at much higher rate, and complainant must press for a decree forthwith, which please do;'" and it was "therefore resolved that this board does not deem it to the interest of the company to accept the proposition contained in the last of the foregoing letters from the solicitors of the complainant, and rejects the same, but that it will entertain the above proposition made by the attorney of the company, but defers present consideration thereof; resolved, that the attorney of the company is hereby instructed to communicate the substance of the foregoing preamble and resolutions to the solicitors for the complainant."

The records of the board do not show that any reference was made to the syndicate agreement at this meeting, but on the next day the record shows that a letter from Messrs. Haggin & Dibble had been received, in reply to the decision of the board, the day before, "which substantially assents to Mr. Sutro's previous proposal, except that they ask that the syndicate agreement be ratified, and that the price at which stockholders will be allowed to subscribe is stated." At the meeting held August 9th, the following letter was read, placed on file, and spread upon the minutes of the board:

"San Francisco, August 6, 1888.

"To the Board of Trustees of the Sutro Tunnel Company—Gentlemen: In accordance with your request for our written opinion and advice on the following matters we herewith state: First. That in our opinion the levying of an assessment upon the shares of the stock of the Sutro Tunnel Company issued as unassessable would be of doubtful validity. We therefore advise against such course. Second. That in our opinion the proposed settlement of the foreclosure suit pending against the company set forth in the annexed preambles and resolutions is for the best interests of the company and its stockholders. We therefore advise the board to make such settlement. Yours, truly, S. M. Wilson,
"Theodore Sutro,
"Edmund Tauszky,
"Of Counsel for the Company."

Whereupon, the following resolutions were adopted: "Whereas, the attorney of this company has laid before this board certain correspondence between himself and the solicitors of the Union Trust Company of New York, the present complainant in the pending foreclosure suit against the company, looking to a settlement thereof; and whereas, this board deems it for the best interests of this company and its stockholders, and is advised by its counsel, to wit, by S. M. Wilson, Theodore Sutro, and Edmund Tauszky, to make such settlement on the following conditions, viz.: That this company consent to the entry of a decree in favor of said complainant, pursuant to the terms of the mortgage in suit, provided—First, that the complainant waive all claims for interest upon interest; second, that all moneys heretofore paid by this company, whether on account of interest upon interest or otherwise, and also all moneys paid by the receiver herein, under order of court, up to the entry of the decree, be credited to this company on account of the sum due in pursuance of the terms of the mortgage: Now, therefore, resolved, that this board hereby consents that a decree shall be entered in accordance with said terms, and the attorneys of the company are hereby directed to consent to such entry."

At the meeting held on the 10th of August the letter of Mr. Peckham, dated June 22, 1888, notifying the company of the assignment of the McCalmont mortgage to the Union Trust Company, was read and spread upon the min-

utes, together with various other letters and documents relating to the matter. The board, after reciting the facts that Sutro, under his power of attorney, consented to the syndicate agreement in so far as it relates to nonforeclosure; that the Union Trust Company had advanced the necessary funds, not subscribed by the stockholders, with which to effect the transfer of the mortgage to the Union Trust Company; and that "one of the conditions of the proposed settlement of the pending foreclosure suit against the Sutro Tunnel Company is that this board should ratify and approve the aforesaid syndicate agreement: Now, therefore, resolved, that the said syndicate agreement is hereby ratified and approved in so far as it relates to nonforeclosure of the property of this company." At the date of this ratification the subscriptions and payments of the stockholders were as follows:

| Rate. | Form. | Number of shares. | Payments. |
|---|---|---|---|
| 50c. | A | 878,772 | $439,386 |
| | B | | 5,342 |
| 55c. | | 377,807 | 207,793 85 |
| | | | |
| Totals | | 1,256,579 | $652,521 85 |
| Deduct 5c. penalty | | | 18,890 35 |
| | | | |
| | | | $633,631 50 |

On the same day (August 10, 1888) a stipulation was entered into that a decree be entered in the foreclosure suit in favor of the Union Trust Company for $1,419,544.22, that being the full amount due on the mortgage after deducting all sums of money paid thereon by the Sutro Tunnel Company and by the receiver. The order of the court for a decree of foreclosure in pursuance of this stipulation was made on the 13th of August, though not entered until October 1, 1888. The interest from the 10th to 13th of August was added, and the decree was for $1,420,209.46, and declared to be a lien upon the mortgaged property, which was ordered to be sold by the United States marshal, who was appointed master for that purpose. On October 1st, Mr. Sutro prepared the following advertisement: "The Sutro Tunnel Company hereby gives notice to such of its stockholders as have not yet subscribed to its bonds that judgment has been entered in the long-pending suit for foreclosure of mortgage in favor of the complainant. One condition of said judgment, however, is that all the shareholders who have not yet subscribed to the new bonds of the company shall have 90 days from October 1, 1888, to save their interest by paying, for the first 30 days, 55 cents, and, for the next succeeding 60 days, 60 cents, per share, on all shares owned by them, for which they will receive the new bonds of the company at the rate of $1 for each 55 or 60 cents so subscribed. Any shareholder who does not subscribe for these bonds within this period of 90 days must necessarily lose his interest in the property of the company. All subscriptions, together with the shares, properly indorsed, must be sent to the Union Trust Company, No. 73 Broadway, New York. For circulars and further information apply to the offices of the company, 320 Sansome street, San Francisco, and Room 123, Produce Exchange, New York,"—which was by the order of the board of trustees published in the New York, San Francisco, and Virginia City papers, once a week, for three weeks. The next day Mr. Sutro issued a circular to the stockholders, explaining more in detail the condition of affairs, giving a statement of the receipts and disbursements of the company for a number of years, and closing with the suggestion that the "new bonds will be a desirable investment." The trustees ordered 3,000 circulars to be printed, and a copy sent to each stockholder, who had not subscribed to bonds, whose address was known, and to be generally circulated by the president, which was done. On October 3d, the reorganization committee issued a circular to the stockholders, embodying substantially the same terms stated in the advertisement of Sutro, and the same statements as contained in the Sutro circular, and closing as follows: "By complying with the terms of this circular you will be regarded as having assented to all the terms and conditions of the said circulars of the executive committee dated, respectively, November 15, 1887, and April 27, 1888." This circular was ex-

tensively advertised. The final results of the subscriptions show that the total amount paid in was $759,741.25, which, after making the reductions on account of penalties, etc., left the amount $723,998.50. The total number of shares of the Sutro Tunnel Company represented in the subscriptions was 1,447,997, leaving the number of shares that did not subscribe at 552,003.

On January 14, 1889, due and proper notice having been previously given, the master sold the property of the Sutro Tunnel Company, under the decree of the court, to the Union Trust Company for $1,325,000, that being the highest bid therefor. The master in due time made his report, and the court ordered that the report and sale "be absolute and binding forever, and that they stand as in all things ratified and confirmed." The master was ordered to execute a deed to the purchaser, which was accordingly done, on the 2d day of August, 1889. On August 31, 1889, the Comstock Tunnel Company was incorporated, under the laws of the state of New York, with a capital stock of $4,000,000, divided into 2,000,000, shares of the par value of $2 each. On October 10th, Mr. Theodore Sutro was elected president, and H. H. Thayer secretary and treasurer, of this corporation. On October 19th, the Union Trust Company deeded to the Comstock Tunnel Company all the property purchased by it at the foreclosure sale, and the Comstock Tunnel Company executed a mortgage to the Union Trust Company to secure the payment of the bonds of the company to an amount not exceeding $3,000,000. The Comstock Tunnel Company issued $2,139,000 face-value bonds, which were distributed as follows:

| | |
|---|---:|
| To subscribing stockholders | $1,448,012 |
| To subscribers who were not stockholders | 10,594 |
| To the syndicate | 538,394 |
| To Theodore Sutro | 92,000 |
| To Seligman & Seligman | 25,000 |
| To H. H. Thayer | 5,000 |
| To Otto Lowengard | 5,000 |
| To Gordon MacDonald | 5,000 |
| To P. C. A. M. Van Weel | 5,000 |
| To H. R. Baltzer | 5,000 |
| Total bond issue, face value | $2,139,000 |

On December 12, 1889, a decree for the deficiency in the foreclosure suit, amounting to $101,365.13, was regularly entered. The property of the Sutro Tunnel Company, consisting of certain real estate not included in the mortgage, was subsequently sold under a judgment obtained by the state of Nevada for delinquent taxes, to the Comstock Tunnel Company for $789.97.

R. E. Houghton (Wm. F. Herrin and H. L. Gear, of counsel), for complainants.

Edmund Tauszky and W. E. F. Deal (Pierson & Mitchell and Pillsbury & Blanding, of counsel), for respondents.

HAWLEY, District Judge (after stating the facts as above). The legal questions involved in this case may be classified under four heads: (1) Jurisdiction; (2) failure of trustees to levy an assessment; (3) position of complainants, and their participation in the plans formulated by Sutro; (4) questions relating to charges of fraud, conspiracy, and violations of trust and confidence.

1. Respondents contend that this court has no jurisdiction of this case (1) because none of the complainants or respondents are residents or citizens of the state of Nevada, and there are aliens, and also citizens of the same state, on both sides of the controversy; and (2) that the doctrine of ancillary jurisdiction is not applicable to the facts of this case. After the filing of the an-

swers, the respondents moved the court to dismiss the bill upon the same grounds. This motion was heard before the circuit judge, and by him denied in a brief opinion, as follows:

"This is a motion to dismiss the bill for want of jurisdiction, on the ground that some of the complainants and respondents are citizens of the same state, and some of the parties on both sides are aliens. The bill is filed, however, to set aside a decree, in the same court, of foreclosure of a mortgage and sale, and confirmation of the sale, of the Sutro tunnel, on the ground of various frauds alleged, by means of which the proceedings are said to have been accomplished. I think that this is but an appendage of, or a suit supplementary and ancillary to, the prior suit. It is but a renewal and continuation of the prior litigation. It is within the cases of Dewey v. Gas Coal Co., 123 U. S. 329, 8 Sup. Ct. 148; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27; Pacific R. Co. v. Missouri Pac. Ry. Co., 111 U. S. 505, 4 Sup. Ct. 583; Johnson v. Christian, 125 U. S. 643, 8 Sup. Ct. 989, 1135; Railroad Co. v. Soutter, 2 Wall. 440, 510; and Jones v. Andrews, 10 Wall. 327. Indeed, the suit could not well be effectually prosecuted in any other court. The court has jurisdiction under these authorities. Let the motion to dismiss be denied."

I therefore decline to review this question.

2. The first question presented by respondents relates to the failure of the trustees of the Sutro Tunnel Company to levy an assessment upon its shares of stock. It is charged in complainants' bill that the trustees wholly disregarded their duty to raise, by lawful assessment upon the shares of the company, the sum required to complete the payment for the McCalmont mortgage, and, in violation of their duty, consented to the guaranty of its bonds by the syndicate, and authorized Theodore Sutro, at his instigation and request, to stipulate with the Union Trust Company for the entry of the decree of foreclosure, and for the sale of all the property of the Sutro Tunnel Company. After setting out at length the provisions in the syndicate agreement that if the necessary amount of money was raised by the subscriptions of the stockholders, or if the Sutro Tunnel Company should pay to the Union Trust Company, "within ninety days after the actual entry of the decree, the amount paid to the former complainants for the mortgage in suit, less the amount which should have been paid over by the receiver up to the expiration of said 90 days, * * * that then the said judgment and decree should be discharged and satisfied of record," etc., the bill further avers "that the said board of trustees allowed the said ninety days to elapse without levying any assessment upon the stock of said Sutro Tunnel Company to repay the amount advanced by said syndicate for the purchase of said mortgage, and allowed the said property of said Sutro Tunnel Company to be sold under said decree, and allowed the time for redemption under said decree to expire, and allowed the sale of said property to be confirmed, without redeeming the said mortgage, pursuant to said stipulation or otherwise, or lawfully providing any means for said redemption, as it might and ought to have done by assessment upon the stock of said company."

It is difficult to see why the charge of neglect of duty in this respect should be made against the trustees in office in 1888, in-

stead of the previous boards. Was it not as much the duty of the trustees in office in 1886 or in 1887, as it was of the board in 1888, to levy an assessment? The truth is that, independent of the legal questions involved, it was the honest opinion and judgment of the different boards of trustees, as well as of many, if not all, of the stockholders, that any attempt to raise the amount of money required to pay the McCalmont mortgage would have been prejudicial. All the facts tend to show that it would have been absolutely useless to attempt to raise the money in that way. The trustees of the Sutro Tunnel Company were not in a position on August 10, 1888, to apply the money subscribed and paid by the stockholders prior to that time, and to have levied an assessment for the balance of the amount necessary to purchase the McCalmont mortgage, as complainants claim they should have done. The trustees had no power, authority, or control of the money which was paid by the subscribing stockholders upon a specific plan for a specific purpose. This money could only be used as provided by the terms of their subscription. But, if such a course could have been pursued, it would have been grossly unjust to the subscribing stockholders. The assessment, if then levied, would necessarily have been against all the shares equally, whether held by subscribing or nonsubscribing stockholders, and the subscribing stockholders would have had a just cause of complaint, upon the ground that such an assessment, under all the circumstances, would have been unfair and inequitable. The McCalmont mortgage contained a provision that "the debt contracted by these presents on behalf of the company, and all further advances on the security thereof, are subject to the express stipulation (which is hereby made) that the stockholders shall not be held liable, in respect thereof, in their individual capacity." With the exception of about 30,000 shares, each certificate of stock of the Sutro Tunnel Company bore upon its face the word "Unassessable." The by-laws of the corporation were amended in 1880, and it was therein provided that the shares "were unassessable." No stockholder had at any time demanded the levying of an assessment for the purpose of enabling the corporation to pay the McCalmont mortgage; but the question as to the propriety and legality of levying an assessment for that purpose had at different times been suggested to the attorneys for the corporation, who had expressed the opinion that, to say the least, the levying of an assessment was of doubtful validity. It is not deemed necessary to judicially determine whether an assessment, if levied, could have been legally enforced. It may, for the purposes of this opinion, be conceded that it could. Cook, Stocks & S. § 242; Railroad Co. v. Spreckles, 65 Cal. 193.[1] But, under all the facts and circumstances of this case, the failure of the trustees, in 1888, to levy an assessment, does not tend to establish any fraud, conspiracy, or willful neglect of duty upon their part, which would authorize a court of equity to set aside the proceedings

[1] 3 Pac. 661, 802.

and decree in the foreclosure suit. The most that could possibly be said against the trustees would be that they erred in not attempting to raise the money by an assessment. But trustees are not liable for mistakes of judgment. Morawetz, in his work on Private Corporations (section 553), says:

"The directors of a corporation are intrusted with wide discretionary powers. They are bound to exercise these powers with the utmost good faith in the interest of the corporation, and to give the latter the benefit of their best judgment; but they are not liable for innocent mistakes. Directors merely undertake to make honest use of such judgment as they possess. They do not insure the correctness of their judgment, and they cannot be charged with the consequences of an honest error of judgment or accidental mistake in the exercise of their discretionary powers."

In Leslie v. Lorillard, 110 N. Y. 532, 18 N. E. 363, the court said:

"In actions by stockholders which assail the acts of their directors or trustees, courts will not interfere unless the powers have been illegally or unconscientiously executed, or unless it be made to appear that the acts were fraudulent or collusive, and destructive of the rights of the stockholders. Mere errors of judgment are not sufficient as grounds for equity interference, for the powers of those entrusted with corporate management are largely discretionary."

See, also, Association v. Childs, 82 Wis. 476, 52 N. W. 600; Watts' Appeal, 78 Pa. St. 370, 391; Green's Brice, Ultra Vires, 407. Especially is this true in all cases where the trustees act under advice of counsel. Spering's Appeal, 71 Pa. St. 11, 21.

3. In reference to the acts and conduct of complainants, and their participation and acquiescence in the various transactions, it must be remembered that the doctrine of ultra vires has two separate and distinct phases,—one, when the public or creditors are concerned, which has no application to this case; the other, where the question is between the stockholders and the corporation, or between it and its stockholders and third parties dealing with it and through it with them. It is this branch with which we have to deal. In Kent v. Mining Co., 78 N. Y. 185, the court said:

"When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express assent, or his intelligent, though tacit, consent, to the corporate action. If there be a departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are per se illegal or are malum prohibitum. Then no assent of stockholders can validate them. It may do acts not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders. They may be made good by the assent of the stockholders, so that strangers to the stockholders dealing in good faith with the corporation will be protected in a reliance upon those acts."

It therefore becomes important to inquire, not only as to the character of the relief sought, but also to ascertain complainants' relations to the various transactions set out in the statement of facts. It would perhaps be difficult to explain what the result would be if the relief asked for by complainants should be granted. It might, and probably would, lead to confusion worse confounded, and liti-

gation more extended and disastrous. It is certain, however, that the relief they ask for is absolutely destructive of nearly everything that has been done by Sutro and the syndicate, and all of their various transactions are claimed to be in fraud of complainants' rights, and the court is asked to set them aside, regardless of consequences. This is to be done apparently for the benefit of all parties holding nonsubscribing shares of stock in the Sutro Tunnel Company; but it is claimed by respondents to be simply for the benefit of complainants, who, according to the averments in the bill, own 15,250 shares. Sutro, the members of the executive and reorganization committees, and the firm of Seligman & Seligman, attorneys, would, according to the contention of complainants, be compelled to return to the Sutro Tunnel Company the money and stock which they received as fees for their services. The syndicate would also have to account for the money paid by the Sutro Tunnel Company to the McCalmonts on the mortgage before it was transferred to the Union Trust Company, although it never received any part or portion of said money. For obvious reasons, the court declines to make any suggestion or conjecture as to what would become of the interests in the property held by the outsiders or the subscribing stockholders in the syndicate, or to speculate as to whether the nonsubscribing stockholders, who are not parties to this ·suit, could be compelled to participate in the future proceedings if the decree is set aside. It is enough to say, for the purpose of illustrating the question under consideration, that there is no direct offer upon the part of complainants to pay any money that might be found due, upon an accounting, from the nonsubscribing shares of stock which they hold. Equity appeals to the discretion of the court for justice. It has frequently been said that nothing can call forth the activity of a court of equity but "conscience, good faith, and reasonable diligence." Have complainants brought either of these ingredients into this case? Stockholders who seek protection against the acts of a corporation which are not directly prohibited by law, although in excess of its powers, must be diligent in order that the court may undo the wrong to them without doing equal or greater wrong to other persons. The jurisdiction of the court is purely equitable, and it must necessarily be governed by equitable principles. Parties who come into court asking equity must do, or offer to do, equity. As was said by Lord Justice Turner in Great Western Ry. Co. v. Oxford, W. & W. Ry. Co. 3 De Gex, M. & G. 359:

"If parties cannot come into equity without submitting to do equity, a fortiori they cannot come for the summary interference of the court when their conduct before coming has been such as to prevent equity being done."

Are complainants in a position to complain of the acts and conduct of the board of trustees of the Sutro Tunnel Company, of Theodore Sutro, of the syndicate, of the executive and reorganization committees, or of the sale and disposition made of the property of the Sutro Tunnel Company? In giving the general history of the various transactions in which Mr. Sutro is the central figure, the

part taken by the complainants does not, perhaps, prominently appear. But a history of this case would be incomplete without a brief reference to their acts and active participation in the premises. In fact, the legal aspects of the case (to be hereafter considered) cannot be fairly determined without a clear and full understanding as to their conduct, as well as that of the respondents. If they favored, encouraged, and aided the various plans proposed by Sutro, and assisted in carrying them out, or, with full knowledge of all the facts, ratified and acquiesced therein, then the question arises whether they are not precluded from attempting to destroy the results which they, in common with other stockholders, assisted in creating. If it be true, as claimed by respondents, that the complaining stockholders are bringing this suit in their own individual interests, and that they participated in all the acts complained of, with knowledge of the facts, then they would be barred of any remedy. Cook, Stocks & S. § 730. If they actively participated in any fraud or conspiracy, if any is shown, with the respondents, then, whatever the rights of innocent stockholders may be, the complainants would not be entitled to any relief. The truth is that the persons who were actually defrauded by the transactions, if any fraud, actual or constructive, took place, would be the few stockholders who took no part in the proceedings, or had no knowledge thereof. As to the stockholders who took part in the fraudulent transactions, if there were any, they are particeps criminis, and are not entitled to any relief. As was said in U. S. v. Union Pac. R. Co., 98 U. S. 569:

"It is against all the principles of jurisprudence, whether at law or in equity, to permit them to litigate this fraud among themselves. If the innocent stockholders are not parties here * * * they would get no relief by the suit."

But it is important, in determining the questions involved in this case, to know in what manner the complainants considered the conduct of respondents, as well as themselves, when the transactions complained of were in process of being carried out. It is essential to know who it is that makes the charges of fraud, conspiracy, and violations of trust and confidence, and to ascertain whether they knew of all the transactions complained of, and openly participated therein, or remained quiet, and made no objection until after they found out that the results attained were not such as they anticipated they would be.

Do they come into a court of equity with clean hands? Is it true that they have been on both sides of this controversy, waiting and watching to finally espouse the cause of the one with which, in their opinion, the greatest profit lies? Can it be said of them, as charged by the respondents' counsel, that, like their prototype in the old play written by Marlowe:

"And thus far roundly goes the business. Thus, loving neither, I will live with both, making a profit of my policy; and he from whom my most advantage comes shall be my friend."

Would they not repel any charge of fraud on their part? Would they not vigorously complain if any of the acts of fraud which they

allege against respondents should be charged against them? Who are they, what have they done, and what are their rights in the premises? Equity rule 94 provides:

"Every bill brought by one or more stockholders in a corporation against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share had devolved on him since by operation of law, and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action."

Complainant Wheelan was not a stockholder during the time of the transactions complained of. He first bought 250 shares of the Sutro Tunnel stock, November 10, 1888, and subsequently, during the same month, bought 500 shares more. He is not, therefore, in a position, under the rule, to be a complainant in this case.

In Hollins v. Railroad Co., 9 N. Y. Supp. 909, the court held that, where a plan for the reorganization of a railroad company is not prohibited by law, one who purchases stock, after the plan is adopted, from a stockholder who voted for such plan, cannot insist that it is ultra vires, and that he is not "in such a position as to ask a court of equity to enjoin the officers of the corporation or the corporation defendant, from doing what his predecessors, as owners of the stock, expressly authorized and directed the officers of the company to do." Complainants Symmes and Aron were stockholders at the time of the transactions of which they complain; and it is alleged in the bill:

"That this suit is not a collusive one, to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance; * * * that the managing trustees of said Sutro Tunnel Company are defendants herein, and are parties to the fraudulent combination and conspiracy hereinafter complained of by your orators; and that any demand upon them to institute this or any action in the name of said Sutro Tunnel Company, to accomplish the objects herein sought to be secured, would be wholly fruitless and unavailing. And your orators aver, upon and according to their information and belief, that the majority of the shareholders of said Sutro Tunnel Company have become shareholders in the Comstock Tunnel Company, a corporation defendant, and that they expect to receive bonds of said Comstock Tunnel Company in lieu of the bonds of the Sutro Tunnel Company to which they have subscribed; and that it is impossible to secure a vote of a majority of the shareholders of said Sutro Tunnel Company to remove said trustees, or to appoint new trustees of said Sutro Tunnel Company, or any trustees who would institute any action to obtain the relief prayed for by your orators; that the said majority of said shareholders, having subscribed to bonds of the Sutro Tunnel Company, have been led by the defendants who have engaged in said fraudulent combination and conspiracy, and as the result thereof, to believe that the said Sutro Tunnel Company has lost all title to its property and franchises under the foreclosure sale hereinafter described, and that the same was transferred to and purchased by the Union Trust Company in trust for the exclusive benefit of the members of the syndicate hereinafter described, and of the shareholders who were subscribers to the bonds of said Sutro Tunnel Company, to the exclusion of all other shareholders of said Sutro Tunnel Company; and

that the said majority of said shareholders will not coöperate with said Sutro Tunnel Company to secure its interests in any manner, unless this court shall first grant the relief sought by your orators in this suit."

These averments, having been sworn to, will be deemed sufficient to comply with the rule as to complainants Symmes and Aron.

Mr. Symmes first appears upon the books as a stockholder in the Sutro Tunnel Company on December 31, 1887, as the owner of 4,000 shares, which were purchased by him from the office of the company in New York. On November 10, 1888, he procured 50 shares more, and on July 23, 1890, 100 shares more were issued to him in San Francisco. On the hearing before the examiner he produced certificates for 3,600 shares of stock issued in the names of other parties, and testified that he held these shares of stock before this suit was commenced, and acquired most of the stock in the spring and summer of 1887, and had a small portion of the stock a year or two before. On the 30th of December, 1887, he subscribed for $1,000 bonds, face value, on the A form, on 1,000 shares of stock, pursuant to the plan of the committee of November 15, 1887; and on November 27, 1888, subscribed on 3,650 shares of stock, at the rate of 55 cents per share, on the plan of April 27, 1888. In May, 1888, he had an interview with Mr. Sutro in New York, when he was fully informed of everything that had been done up to that time, and was then advised that it would be necessary to organize a syndicate, and perhaps pay it a large commission for subscribing the amount necessary to purchase the McCalmont mortgage. On August 6, 1888, the chairman of the reorganization committee addressed a letter to Mr. Symmes, in which, among other things, he detailed the plans of reorganization, informed him all about the syndicate and of its purchase of the mortgage, and offered to extend the time for further subscriptions at 50 cents until the 25th of the month. On September 3, 1889, three months before this suit was commenced, he received and accepted $12.98, interest on his bonds at 4 per cent. per annum from date of his payments to January 1, 1888. He admits in his testimony that when he subscribed for the bonds he remembered reading the closing paragraph of the circular, that "a compliance with the terms of this circular will be regarded as your assent to the reorganization plan, with foreclosure if necessary," and further admits that he had knowledge of the transactions in relation to the efforts made to raise the necessary money; but he testified that Sutro did not tell him, and that he did not know, that Sutro was to receive $100,000 as a fee, or that the executive and reorganization committees and attorneys Seligman & Seligman were to receive any fees, and that his first knowledge of Sutro's fee was obtained from the answer in this suit.

As to complainant Joseph Aron, the facts fully sustain the assertion of respondents' counsel that, "from the beginning of the transaction here disputed to the end of it, Mr. Aron was advised

of every step, every proposed change or modification of plan, and every hope and every fear of any of the parties connected with it." Aron was one of the incorporators of the Sutro Tunnel Company, was the president thereof from 1872 to 1874, and had over 10,000 shares of stock standing in his name on the books of the company. Mr. Lowengard, who was a member of the executive and of the reorganization committees, was Mr. Aron's confidential agent and broker, and acted throughout all the transactions in that capacity. He was one of the stockholders who first employed Mr. Sutro, and asked his aid, assistance, and advice. He is also made a respondent in this suit, and is charged by complainants with being one of the conspirators in the commission of the alleged frauds. There is not a scintilla of evidence in the voluminous record, nor is it claimed by complainants' counsel, that Lowengard ever exceeded his authority as Aron's agent, or that he at any time withheld from Aron any material fact or circumstance in relation to any of the transactions, whereby Mr. Aron was misled or deceived as to the true and actual condition of the affairs as they transpired. On the contrary, the record affirmatively shows that Mr. Lowengard informed Mr. Aron of every move that was taken in the efforts of Sutro and others to defend the foreclosure suit; to raise the money to pay off or purchase the McCalmont mortgage; the formation of the various plans adopted by the committees, and approved by the trustees of the Sutro Tunnel Company; the organization of the syndicate; the signing of the syndicate agreement, and the contents thereof; the purchase of the mortgage, and assignment thereof to the Union Trust Company,—and that Mr. Aron, with full knowledge of all the facts, consented to, ratified, and approved of all these transactions and negotiations, and of Mr. Lowengard's action and conduct in connection therewith.

Mr. Lowengard testified: That he interested himself in the affairs of the Sutro Tunnel Company, as the representative of Mr. Aron, in December, 1886. That he then cabled to Mr. Aron, in Paris, that Messrs. Baltzer, Stursberg, and others had organized a movement to put the interests of the Sutro Tunnel stockholders into the hands of Mr. Theodore Sutro, and received an answer: "We approve. Sign in your own name. Aron." That thereupon the firm of Palmer & Lowengard signed in their own names for 30,000 shares for Mr. Aron, and afterwards subscribed for 1,000 shares more. Mr. Aron did not want to sign in his own name because he had, or imagined he had, some special grievance against the McCalmonts and others, and wished to push that matter, whatever it was, whether the foreclosure suit was settled or not. On May 27, 1887, Mr. Aron wrote to Lowengard, with reference to the subscriptions, as follows:

"You can sign in your individual name if, as Stursberg says, no liabilities. You know me well enough that I would not dare to ask it of you if there was any liability to it. But as my agent I do not wish to sign it. By doing this all would be lost to me, as far as I am concerned, and I do not intend it to be so. I will be able to place lots of bonds, I am satisfied.

On November 30, 1887, in answer to a letter of Mr. Lowengard informing him that he would have to pay $15,500 on his 31,000 shares, Mr. Aron wrote:

"First of all, let me assure you that I appreciate very much all the trouble, pains, &c., you have taken in my behalf.   *   *   *   You are in a committee representing 31,000 shares. You would like to see your proposition carried out; that is, anyway, as far as yourself are concerned, be one of the signers of the taking of the bonds. Well, I have been trying to do the very thing without doing it myself, as, for reasons explained, I wish to leave myself out of all direct subscriptions. You represent the 31,000 shares you have on hand. (You do not represent J. A.) This letter will reach you on or about the 10th of December. I shall cause, before this, to get the party whom I told you some time ago to cable you, 1st, 10%, then the balance; making, in all, $15,500. This you will, of course, subscribe in the name of the party that will be mentioned to you, or you may even subscribe it, if you prefer, 'Ott Lowengard, agent.' In this way you, as member of the committee, will have subscribed, and I suppose this will be satisfactory to you. Again thanking you for your trouble, believe me to be at your disposal if I can be of any use to you in Paris."

On May 10, 1888, Mr. Aron wrote to Lowengard:

"What you have done about the 31,000 shares   *   *   *   has been approved."

In a letter written to Mr. Lowengard on the 30th of July, 1888, Mr. Aron referred to the large reduction made by the McCalmonts for the benefit of the syndicate and subscribing stockholders, complains of the acts of Sutro, and declares that:

"The bonds will not be issued by the Sutro Tunnel Company because that company will be wiped out. The new company is not yet formed which can issue them.   *   *   *   Of course, neither I or anybody else can find any fault for a committee to buy a mortgage and foreclose it. But to do so with the aid and advice of the company's own counsel, own president, whose only authority is derived from the company, for the purpose of freezing out, &c., &c., seems to me preposterous and wicked.   *   *   *   Of course, $100,-000 fee to Theodore Sutro could not be paid by the S. T. Co.; only the profit of a scheme could do it."

The record shows that, when this letter was written, Mr. Aron had subscribed on 31,000 shares for $31,000 face-value bonds, and paid $15,500, upon the plan which he denominates a "preposterous and wicked scheme." This letter, which, like the Parthian arrow, pierces as he who casts it flees, clearly shows, by a careful reading between the lines, that in Mr. Aron's opinion it was only preposterous and wicked because some one by the name of Sutro was connected with it. Nobody, not even Mr. Aron, could find any fault "for a committee to buy a mortgage and foreclose it." That would be an honest, straightforward, business transaction, provided Mr. Sutro did not get any fee. The entire letter was evidently written by Mr. Aron for the purpose of casting discredit upon the conduct of Sutro, and at the same time to indorse everything that was done by his own agent, in order that he, as principal, might profit by the transaction. When complainants Symmes and Aron subscribed for their stock, with full knowledge of all the facts, they did not think they were guilty of any fraud, or that they were encouraging any conspiracy to defraud any stockholder of the Sutro Tunnel Company of his property or rights. . They con-

sidered that all the proceedings that were taken in the premises were fair, legitimate, business transactions. They favored the plans, encouraged them, and aided them by their subscriptions and their money, when they knew or believed that a new company would have to be organized to issue the bonds, and that the Sutro Tunnel Company would be wiped out of existence. Why Mr. Symmes retained a portion of his stock in the Sutro Tunnel Company, upon which he did not subscribe, does not appear. But the reason why Mr. Aron did not subscribe on all his stock has already been referred to, and is made perfectly clear. He wanted to save some for the purpose of enabling him to have, as he supposed he would thus have, a legal standing against the McCalmonts, Kidder, Peabody & Co., and Adolph Sutro in relation to their prior connection and conduct in the affairs of the Sutro Tunnel Company, for the assertion of some rights of which he thought, and evidently still thinks, he had been unfairly or fraudulently deprived. But, whatever their motive, purpose, or object may have been in retaining a portion of their stock in the Sutro Tunnel Company without subscribing thereon to the scheme of which they now complain, it seems perfectly clear to me that, having subscribed upon a large proportion of their shares of stock, and having, with full knowledge of all the facts, ratified, acquiesced, and approved of the plans adopted by the executive and reorganization committees, and of everything that was done by the syndicate, except the payment of a fee to Sutro, and waited for a period of 18 months after the signing of the syndicate agreement before taking any action to protect their nonsubscribing shares of stock, they are not in a position to maintain this suit. Although it is averred in the bill that this suit is brought for all other stockholders who did not subscribe, it is a significant fact that not a single other nonsubscribing stockholder has, so far as the record shows, complained of any deprivation of his rights, or offered to come forward and pay his proportion of the expenses of this litigation, or claimed any privilege to share in its results.

In Berry v. Broach, 4 South. 117, the supreme court of Mississippi held that it was within the power of a majority of the stockholders to make the sale of the property of an incorporated company doing an unsuccessful and unprofitable business, and that, even if such sale was voidable by the nonparticipating stockholders, a stockholder who participated in the sale could not avoid the contract, which had been ratified by the acquiescence of the other stockholders.

In Matthews v. Murchison, 15 Fed. 691, the court held that a bondholder of a former organization had no standing in a court of equity to dissolve a new organization of a railroad company for which her agent had voted bonds, and to enforce a different plan, where it appears that she had known of what her agent was doing and did not dissent; but had accepted her share of the bonds of the new organization, and so acted as to induce others to believe she had acquiesced in the new organization. There the old company had made default in the payment of its debts, and its property was sold, and bought in by the first mortgage bondholders. The

old corporation was dissolved, and a new one formed, to which the property and franchises of the old corporation were conveyed. There, as here among the stockholders, there had been consultation among the bondholders respecting the sale and purchase of the property, and the plan of reorganization to be followed when the purchase was made; and it was in respect to these plans that the complainant filed her bill. It appeared that the complainant received her proportion of bonds in the new organization without objection; yet, according to the averments in her bill, she knew the company was illegally organized, and had no power to issue either bonds or stock. French had acted as her agent, and, although she claimed that French had exceeded his authority, it was shown that she knew of his acts and had ratified the same. Upon this state of facts the court said:

"To come into a court of equity, and ask it to set aside the organization of the new company, under these circumstances, and to take its property out of its hands, and put into those of a receiver, is little else than monstrous. Every act of complainant and her husband after the vote of French led the public and the committee of purchase and organization to suppose they acquiesced. The law and good conscience required that if they disapproved French's conduct, and denied his power to act as he had done, then to say so at once, and not mislead everybody by dealing in the worthless securities which they secretly meant to repudiate. Whether this is an estoppel or a ratification is of little consequence. Not to regard it as one or the other would work the greatest injustice to the other bondholders. We think this decides the matter, and is fatal to complainant's claim for a receiver, now, or at any other time, under her bill of complaint."

In Kent v. Mining Co., supra, the court said:

"Where third parties have dealt with the company, relying in good faith upon the existence of corporate authority to do an act, then it is not needed that there be an express assent thereto on the part of stockholders to work an equitable estoppel upon them. Their conduct may have been such, though negative in character, as to be taken for an acquiescence in the act; and, when harm would come to such third parties if the act were held invalid, the stockholders are estopped from questioning it. We suppose acquiescence or tacit assent to mean the neglect to promptly and actively condemn the unauthorized act, and to seek judicial redress, after knowledge of the committal of it, whereby innocent third parties have been led to put themselves in a position from which they cannot be taken without loss. It is the doctrine of equitable estoppel, which applies to members of corporate or associated bodies, as well as to persons acting in a natural capacity."

In Rabe v. Dunlap, 25 Atl. 962, the court of chancery of New Jersey said:

"Where an act is done openly, and especially on notice, and without evil intent, though clearly in excess of the power of the corporation, a nonassenting stockholder will not be allowed to pause to speculate upon the chances,—to wait until he can see whether such act is likely to result in profit or loss,—but, to be entitled to the summary interference of the court, he must ask for it promptly, and before the act of which he complains has become the foundation of rights or equities which must be destroyed or greatly impaired if the act be nullified or undone. Or, stated with greater brevity and in its simple essence, the rule is this: If he wants protection against the consequences of an ultra vires act, he must ask for it with sufficient promptness to enable the court to do justice to him without doing injustice to others. * * * This principle must control the decision of the present application. No argument is required to show its pertinency. When the leading facts of the case are recalled, it applies itself. Whether the com-

plainants remained inactive to speculate upon the chances, intending to abide by the consolidation if it resulted in benefit, and, if not, to try to undo it, it is manifest that they acted precisely as they would have done if such had been their intention."

See, also, Kitchen v. Railroad Co., 69 Mo. 225, 261; Thornton v. Railway Co., 81 N. Y. 462; Ashhurst's Appeal, 60 Pa. St. 290; Watts' Appeal, 78 Pa. St. 370, 394; McGeorge v. Improvement Co., 57 Fed. 262, 268; Streight v. Junk, 8 C. C. A. 137, 59 Fed. 323; Oil Co. v. Marbury, 91 U. S. 587; Hotel Co. v. Wade, 97 U. S. 13; Indianapolis Rolling Mill v. St. Louis, etc., R. Co., 120 U. S. 256, 7 Sup. Ct. 542; Cook, Stocks & S. §§ 161, 729, 732; Mor. Priv. Corp. §§ 262, 264, 624, 631.

These views virtually dispose of this case; but in view of its magnitude, and of the many charges of fraud that have been made, it is deemed proper to review the case upon its merits.

4. The only debatable question is whether the facts show any constructive fraud upon the part of Mr. Sutro or his associates, or any violation of trust or confidence of such a character as requires a court of equity to interfere, and declare the transactions, however innocent they may have been intended, to be fraudulent in law. Constructive fraud is such as the law infers from the relationship of the parties and the circumstances and conditions by which they are surrounded, regardless of any actual dishonesty of purpose or evil design. There are certain well-defined principles, which have become axiomatic in the jurisprudence of this country, with reference to the acts, conduct, and duties of the directors, trustees, and officers of a corporation in their relations with the corporation and with its stockholders. The officers of a corporation are trustees for the creditors and stockholders; and if an officer thereof, by means of his power as such, secures to himself any advantage over other stockholders or creditors, equity, with its strong arm, steps in, and treats the transaction as void or voidable, and will charge him as a trustee for the benefit of the innocent and injured parties. The officers, being in a place of trust, are, of course, obliged to execute their duties with fidelity, not for their own benefit, but for the common benefit of all the stockholders of the corporation. The directors and trustees of a corporation hold a fiduciary relation to the stockholders. They are intrusted with the management and control of the property of the corporation for the benefit and advantage of all the stockholders, and are therefore necessarily concluded from doing any act, or transacting any business, in which their own private interests or individual business will come in conflict with the duty they owe to each and every stockholder of the corporation. The same person cannot act for himself for gain, and at the same time, with reference to the same thing, act as the agent of others whose interests are conflicting. "No man can serve two masters, for either he will hate the one and love the other, or else he will hold to the one and despise the other."

Equity does not, as a general rule, permit persons occupying fiduciary relations to be placed in such a position that the influence of personal motives is liable to be so strong a temptation as to

overcome their duty, or have a tendency to lead them to a betrayal of their trust. Directors or trustees are not allowed, by the rules of equity, to transact any business in relation to the corporate property with themselves, or to acquire any interest therein for their individual advantage, to the detriment of the stockholders of the corporation. It is not, however, so much the profit to themselves, as it is the detriment to others, that furnishes the ground for setting the transaction aside. The officers of a corporation are always required to exercise the utmost good faith in all their dealings with their cestui que trust, and should be ready at all times to explain all that they have ever done in connection with their management of the trust property. The books are full of cases sustaining these general principles; and in all such cases the rules should be rigidly enforced, so as to deprive them of all the benefits and advantages which they obtained, by setting aside the transactions, and disarming them of all legal sanction or protection for their acts.

But the question here to be decided is whether the facts presented by the record are of such a character as to bring this case within the application of these principles. The facts speak for themselves. They must be taken in their entirety, and weighed and considered with reference to all the conditions and surroundings of the Sutro Tunnel Company. Suit had been commenced to foreclose a mortgage against its property for about $1,500,000. There was no real defense to the suit. It owed the money, and its property was subject to the lien of the mortgage. A receiver had been appointed. An attorney had been employed. Testimony had been taken by the owners of the mortgage. Interest and costs were rapidly accumulating. The time for final hearing was near at hand. The stock of the company had depreciated in the market. The company had no ready money, and no means of raising sufficient to meet the demands of the suit. The question of levying an assessment was not even mooted. The trustees then in office were friendly to McCalmont Bros. & Co. They evidently and honestly believed that any attempt to levy an assessment would be useless, or that it would doubtless lead to litigation; and staggering, as the company then was, under heavy burdens, further litigation meant disaster to the company, if not the utter destruction of its property. This was the condition when Mr. Sutro first appeared to take hold of the company's matters, and make an effort to save the life of a tottering corporation which was overwhelmed in debt far beyond the market value of its property. These conditions must be kept constantly in mind in determining whether his acts were fair and open, or secret and fraudulent, in the various transactions that thereafter took place. There was a general belief among some of the stockholders living in New York City that the trustees were not inclined to defend the foreclosure suit or in any manner to protect the corporation, and were also of opinion that the property of the company, although heavily incumbered with a mortgage lien, was of great value, and that some

united effort ought to be made to try and save it from foreclosure and sale. It is wholly immaterial whether their belief was well or ill founded. It was with that object in view—a laudable one, to say the least—that Mr. Sutro was consulted by them, which fact afterwards led to his employment as counsel for the company.

The mere fact that an officer deals with the corporation in business transactions does not, of itself, make the transactions fraudulent in law. If any officer of the corporation, after the foreclosure suit was commenced, had had the money, and was disposed to do so, he could have made a loan to the corporation in order to extricate it from its existing difficulties, if the transaction was open and free from actual fraud, without placing himself under the ban of prohibited acts. In Oil Co. v. Marbury, 91 U. S. 589, the court said:

"While it is true that the defendant, as a director of the corporation, was bound by all those rules of conscientious fairness which courts of equity have imposed as the guides for dealing in such cases, it cannot be maintained that any rule forbids one director among several from loaning money to the corporation when the money is needed, and the transaction is open and otherwise free from blame. No adjudged case has gone so far as this. Such a doctrine, while it would afford little protection to the corporation against actual fraud or oppression, would deprive it of the aid of those most interested in giving aid judiciously, and best qualified to judge of the necessity of that aid, and of the extent to which it may safely be given."

See, also, Hotel Co. v. Wade, 97 U. S. 13; Warfield v. Canning Co. (Iowa) 34 N. W. 467; Gorder v. Canning Co. (Neb.) 54 N. W. 833; Duncomb v. Railroad Co., 84 N. Y. 191, 88 N. Y. 1; Railroad Co. v. Spreckles, 65 Cal. 193, 3 Pac. 661, 802; Cook, Stocks & S. § 661.

The rule in relation to constructive fraud is founded in an anxious desire of the law to apply the principle of preventive justice, so as to shut out the inducements to perpetrate a wrong. It was adopted to secure justice, not to work injustice; and for this reason limitations and qualifications have been made upon its operation and effect which are well calculated to guard it against evil results as inequitable as those it was designed to prevent. Morawetz, in his work on Private Corporations (volume 1, § 521), speaking of the qualification of the rule, says:

"But the rule referred to is not an arbitrary one. It is founded on reason, and should not be applied without regard to the circumstances of the case. A merely nominal or a naked legal interest in the subject-matter of a transaction would not disqualify an agent from representing his principal in the transaction, if there is no temptation to the agent to obtain an advantage at the expense of the principal."

Any officer acting in good faith, for the benefit of the corporation, certainly had the right to use his official power and influence in endeavoring to induce other persons to give such aid as would relieve, or tend to relieve, the corporation from its financial embarrassments, or to secure a settlement or compromise of the pending litigation; and it was within the legitimate and lawful power of the board of trustees to employ any person—even one of their own members, if deemed advisable so to do—to act as agent or attorney of the corporation, and request him to devote his time, energy, and

ability, and to use all necessary and honorable means, to the accomplishment of such a purpose, and to agree in advance to pay him a reasonable compensation for his services. Bagaley v. Iron Co., 146 Pa. St. 478, 23 Atl. 837; Brown v. Silver Mines, 17 Colo. 421, 30 Pac. 66; Mor. Priv. Corp. § 508; Pew v. Bank, 130 Mass. 391, 395; Construction Co. v. Fitzgerald, 137 U. S. 99, 111, 11 Sup. Ct. 36.

Mr. Sutro, as before stated, had been employed by a number of stockholders to look after their interests. He ascertained that it would be difficult, if not impossible, to accomplish anything in their behalf without having the aid of the trustees, and being clothed with the authority of the corporation to act. He so notified the stockholders, and they, with him, immediately commenced active efforts to elect a new and more favorable board of trustees. There was no fraud; no conspiracy. It was their open and avowed purpose to save the company's property if it could possibly be done. A majority of the stockholders deemed it advisable to make a change in the management. Surely, they had the unquestioned right to do this. The rule is well settled that a majority of the trustees have the power to control all questions relating to the affairs of the corporation as long as their acts are not ultra vires. As is said in Cook on Stockholders (section 684):

"The corporate directors, so long as they act within their powers, may use their own discretion as to what ought to be done. Such, also, is the rule with the majority of the stockholders in meeting assembled. An act intra vires and without fraud is an act of internal management, and a minority of the stockholders are powerless to prevent, control, change, or question that act."

See, also, Road Co. v. Jewell, 8 B. Mon. 144.

Mr. Sutro was regularly elected as counsel of the corporation, and his salary agreed upon, at the annual election held March 28, 1887. He thereafter continued his efforts in behalf of the stockholders and the corporation. He formulated the subscription and bond plans of November 15, 1887, and of April 27, 1888. The trustees were at all times advised with reference to these plans, and to his efforts to induce stockholders to subscribe thereto, and of his efforts to secure a reduction of the mortgage debt; and with full knowledge of all the facts they indorsed, approved, and ratified all his acts in relation thereto. The principal contention of complainants is that he withheld the facts in regard to the syndicate agreement until the last moment, and that Mr. Wilson, of counsel for the Sutro Tunnel Company, was not fully advised in regard thereto when he joined with Mr. Sutro and Mr. Tauszky in writing the letter to the trustees, recommending the proposed settlement, which led to the action of the board consenting to a decree upon the terms proposed. Mr. Wilson had for more than a quarter of a century maintained his position in the front ranks of the legal profession in the city of San Francisco. He was a man of well-known probity of character and of unquestioned legal ability. His advice was naturally calculated to have great weight, if not controlling influence, in the final decision and action of the trustees. Complainants' counsel, in commenting upon the facts, said:

"We do not want to be understood to say that Mr. Sutro could control Mr. S. M. Wilson in a matter of this kind; but that he did not submit to Mr. Wilson this syndicate agreement is painfully evident."

Is it possible that knowledge of this syndicate agreement, and of its terms, was withheld from Mr. Wilson? The knowledge of the trustees, of Mr. Ames, the secretary, the acts of Lilienthal, the employment by him of Mr. Jarboe, the reasons given for his employment, the character of Mr. Wilson, the positive testimony of Mr. Sutro, and all the facts and circumstances in connection with the action of the trustees, are such as to convince the court that Mr. Wilson was fully advised in regard to the terms and conditions of the syndicate agreement when he signed the letter. The trustees knew what they were doing when they consented to the entering of the decree. They knew what the terms of the syndicate agreement were. They knew it was the only hope—the only chance—to get a further extension of time for 90 days. If the money could be raised in that time from the stockholders, the Sutro Tunnel Company could retain its life. If it could not be raised, its existence would come to an end. A new company would have to be formed. Reorganization was certain to take place. The stockholders who did not subscribe would lose all their interest in the property. All these things were painfully evident to the board of trustees when they acted in the premises. Complainants Symmes and Aron also knew what the result would be. With full knowledge of all the facts, they acquiesced and permitted the result to be accomplished without objection, and without taking any steps to prevent it.

No portion of the money paid by the syndicate for the purchase of the mortgage belonged to the Sutro Tunnel Company. When the mortgage was transferred and assigned to the Union Trust Company, it belonged absolutely to the subscribing stockholders and the outsiders who constituted the syndicate, subject only to the right of the nonsubscribing stockholders to come forward within 90 days and save their stock if so inclined. It is argued by complainants that in everything that was done by Mr. Sutro he was working to secure his contingent fee. This may be conceded. It would be strange, indeed, if he did not expect to get a good fee for his services. But it is claimed that the fee agreed upon and promised by a majority of the trustees, and allowed by the syndicate, was excessive, exorbitant, and outrageous. Could not the corporation have well afforded to pay him the sum of $100,000 if he had succeeded in carrying out his object of getting sufficient funds from the subscribing stockholders to the plans which he had formulated? The amount of the fee was large. The work to be done was stupendous. Who would have undertaken it without the hope or promise of a suitable reward? The work was difficult, and required extraordinary efforts. It demanded all his time, energy, and ability, as well as "his fertility of resources," so often referred to by counsel. Mr. Sutro received no more advantage or benefit from the syndicate agreement than had been promised him by the trustees if his other plans could have been carried out. The syndicate simply agreed to pay him the same amount of money that had been

originally promised by the trustees. The subscribing stockholders evidently deemed that this was just, right, fair, and proper in the premises. Mr. Lowengard, on the 31st of August, 1888, in answering a letter received from Mr. Aron, complaining of Sutro, and especially of the large fee which he was to receive under the terms of the syndicate agreement, expressed views which are directly applicable to this question, as follows:

"My Dear Mr. Aron: Your letter of July 30th has duly come to hand, and, according to your wishes, I have shown it to all the members of the reorganization committee. All of them feel, like me, that your antagonism against everybody of the name of Sutro must make you look at the doings of Mr. Theodore S. in a strongly prejudiced way. Whilst it is not necessary for me to enter into all the details, I only wish to submit to you the question, what would have become of the Sutro T. Co. if Theodore S. had not, a year and a half ago, begun to fight McCalmonts in the interests of the stockholders? The answer is very simple. The property would have been foreclosed long ago, in the interest of McCalmonts only, without even the attempt of a defense on the part of the company, whose lawyer Mr. Theodore Sutro was not at that time, and without any of the stockholders having had a chance of preserving their rights in the old or a new company; for you must admit that if a full decree had been entered then, with compound interest, and in view of additional 18 per cent., court and interest expenses, there would not have been the slightest probability that anything like the necessary amount could have been raised from the widely-scattered stockholders? Mr. Sutro was the man who took up the whole matter; and if, owing to the stubbornness and unwillingness of many stockholders, he may not succeed in saving the old company in its present form, he will have certainly managed to preserve the property for those shareholders who were willing to bring some sacrifices towards that end (if it can be called a sacrifice at all, when you give people a probably very good interest-bearing security for their money advances.) That Mr. Sutro wanted to make money for himself out of the matter, can you blame him for that? Was he under any obligations to anybody to defend the suit? I agree with you that the amount is very large indeed; but he has devoted his entire time to this matter for more than a year and a half, and, moreover, a majority of the members of the old board had promised him the amount at the beginning of his attempt to do something towards saving the shareholders. He has always maintained, and still clings to the hope, that the old company ought to be kept alive if possible. If he, nevertheless, now consents to a decree, it is simply because he—and every lawyer whose opinion I have heard in the matter—knows very well that there is no valid defense; so that I understand even the court has advised some such plan as is being carried out. Still more time for the delinquent stockholders (90 days), and a reduction in the decree to the simple interest basis, is a valuable consideration, and Mr. Sutro has strenuously fought for that against the interest of the syndicate. I and all the members of the committee fail to see how bona fide shareholders can claim to receive ampler time or facilities to protect their property. Originally, nobody thought it would be necessary to call in the assistance of a syndicate, who naturally want to make a big profit, but it was expected that the shareholders themselves would protect their property. Had they done so, that would, of course, have saved a large amount of money to the new or old company. But it is of no use to blame Mr. Sutro for the course of events."

Whatever criticism may be indulged in as to Mr. Sutro's actions and conduct, it cannot be fairly said that he obtained any undue or improper advantage by virtue of his position as counsel, trustee, or president of the Sutro Tunnel Company, to the detriment of any of the rights of the subscribing stockholders. He constantly advised with the trustees; notified them of every step he was tak-

ing; informed them of what he had done, what he desired to do, and hoped to be able to accomplish; and consulted with other officers of the company, some of the leading stockholders, and various members of the executive and reorganization committees, and with other attorneys for the company as to what was best to do. He earnestly protested when his plans were interfered with, and frankly stated that such interruptions and interference would result, if continued, in the loss of the property of the corporation, and that a syndicate would have to be organized with outsiders, to whom a bonus would have to be paid, and subscribing stockholders; that he wished to avert this if possible, and asked for the confidence, support, and assistance of the trustees, and finally, when all his efforts in that direction failed, he submitted and recommended the syndicate agreement for approval, with the results before stated. Without specifically noticing other points discussed by counsel, or further comment upon the evidence, it is deemed sufficient to say that, after a careful and thorough examination of all the testimony contained in the voluminous record, the mind of the court has been irresistibly led to the conclusion that no actual fraud or conspiracy has been established against any of the respondents; that the acts of Sutro, of the executive and reorganization committees, and the board of trustees of the Sutro Tunnel Company were openly done, with full knowledge, and with as much notice as could reasonably be given to all parties interested; that no advantage was taken by any of the respondents who held fiduciary relations with the corporation, to the detriment or injury of the complainants; that there was no betrayal of trust or violation of confidence; that the facts are not of such a character as to raise any question of a constructive or resulting trust, or to bring the case within the application of the rule as to constructive fraud, and are insufficient to justify this court in granting the relief prayed for.

These conclusions are, in my opinion, fully sustained by the authorities. Morawetz, in his work on Private Corporations (section 812), says:

"The term 'reorganization' is commonly applied to the formation of a new corporation by the creditors and shareholders of a corporation which is in financial difficulties, for the purpose of purchasing the company's works and other property, after the foreclosure of a mortgage or judicial sale. The result of a transaction of this kind is to form a new corporation to carry on the business of the old company upon a new basis, free from its debts and obligations, except to the extent that they have been expressly assumed."

Cook, in his work on Stocks and Stockholders (section 654), in treating of the same subject, and of the purchase of the corporate property by a majority of the stockholders, says:

"Accordingly, it is found to be expedient, during or previous to a railway foreclosure suit, for the parties interested in the property, whether they be the stockholders or bondholders, or mere outsiders, to formulate and propose to the bondholders and stockholders a plan of reorganization whereby, after a foreclosure sale, the purchaser of the property will allow the said bondholders, and often, also, the stockholders, to come into a new company, which shall own the property so purchased. It has been found necessary,

in most cases, to reorganize on some such plan, in order to quiet the defense to the foreclosure, or to raise the funds required in the reorganization, or to obtain a charter from the state for the reorganized enterprise, or to preserve intact the system of railways, branches, leases, and connections, which give value to the property foreclosed. This method of effecting a reorganization is legal and valid, since it involves an ordinary foreclosure of a mortgage, and an agreement of interested parties to purchase at the foreclosure sale. The foreclosure cuts off all rights of the old corporation and stockholders to the property foreclosed, and also the rights of the bondholders whose mortgage is foreclosed. The only rights which any of these parties have after the foreclosure are such rights as the plan or contract of reorganization gives them. By this plan, generally, the old stockholders are allowed to come into the new corporation upon the payment of a fixed sum for each share of stock held by them. The bondholders are generally allowed to exchange the old bonds for new ones in the new corporation, on different terms of interest and times of payment. Plans of reorganization such as this are favored by the courts. There must, however, have been no fraud or collusion exerted, whereby the property at the sale brings less than its real value. The courts uphold purchases by the reorganization company for the reason that thereby a better price is obtained for the property than could probably be obtained otherwise. Thus it has been held that a purchase of corporate property by a majority of the stockholders at a foreclosure sale, if made in good faith and without oppression or undue advantage being taken of the minority, is legal and valid. It is not constructive fraud."

In Shaw v. Railroad Co., 100 U. S. 612, the court said:

"The power of the courts ought never to be used in enabling railroad mortgagees to protect their securities by borrowing money to complete unfinished roads, except under extraordinary circumstances. It is always better to do what was done here whenever it can be; that is to say, reorganize the enterprise on the basis of existing mortgages as stock, or something which is equivalent, and by a new mortgage, with a lien superior to the old, raise the money which is required, without asking the courts to engage in the business of railroad building. The result, so far as incumbering the mortgage security is concerned, is the same substantially in both cases, while the reorganization places the whole enterprise in the hands of those immediately interested in its successful prosecution. The bare fact that some of the trustees were holders of bonds secured by their trust is not sufficient, of itself, to make them incompetent to consent to such a decree as was rendered. From the whole case it is apparent that from the beginning their conduct was governed by the wishes of a very large majority of bondholders. If there was anywhere the slightest evidence of fraud or unfaithfulness, their conduct would be carefully scrutinized. The acts of trustees, when personally interested, should always be open and fair. Slight circumstances will sometimes be considered sufficient proof of wrong to justify setting aside what has been done; but when everything is honestly done, and the courts are satisfied that the rights of others have not been prejudiced to the advantage of the trustee, the simple fact of interest is not sufficient to justify the withholding of a confirmation of his acts."

In Hayden v. Directory Co., 42 Fed. 875, the stockholders of a corporation which was financially embarrassed resolved to wind up its business, and authorized the trustees to sell the property to pay debts. At a sale duly advertised, of which the stockholders had notice, the property was struck off to the secretary, who bought it in the interest of a combination of stockholders, formed in good faith, for their own protection. The property was sold for all it was worth, and the purchase by the secretary was approved by all of the stockholders except the complainant. The court held, it not being shown that the action of the majority was

oppressive or in bad faith, that the sale should not be set aside, and the injunction asked for was refused. In the course of the opinion, Wallace, J., said:

"The real question in the case is whether the majority stockholders were acting in good faith towards the complainant as a minority stockholder in authorizing the sale of the property, and its purchase by the new corporation. The right of the majority stockholders of a corporation established for manufacturing or trading purposes to wind up its affairs and dispose of its assets, even against the objections of the minority stockholders, whenever it appears that the business can be no longer advantageously carried on, is well recognized."

In Hotel Co. v. Wade, 97 U. S. 22, the court said:

"Differences of opinion existed among the stockholders as to the best way of raising the money, and prior discussions had not tended to quiet the dissensions; but the stockholders at the meeting referred to decided to adopt the proposition which was carried into effect. Beyond doubt, some of the conditions of the proposition were somewhat peculiar; but the proofs show that it was openly submitted to the stockholders, and that they adopted it by a majority of their votes; that the bonds were subsequently issued, and that they were voluntarily secured by the mortgage or trust deed set forth in the record. * * * Examined in the light of the circumstances attending the transaction, as the case should be, the court is of the opinion that the evidence fails to support the proposition that the bonds and mortgage are invalid because the directors became the holders of the bonds and advanced the money. Transactions of the kind have often occurred; and it has never been held that the arrangement was invalid, where it appeared that the stockholders were properly consulted, and sanctioned what was done, either by their votes or silence."

In Harts v. Brown, 77 Ill. 226, the court held that where a company is insolvent, and has no means to discharge its debts, and the directors give all the stockholders an opportunity of making advances to relieve the company of its embarrassment, which they refuse to embrace, the directors will have the right to purchase the indebtedness, and acquire title to the corporate property, by enforcing its sale under a deed of trust given to secure such indebtedness, and the other stockholders will have no right to complain. Among other things, the court said:

"The stockholders had been called together, and they were urged to make advances in proportion to the stock they severally held; and thus relieve the company and preserve its existence; but this they refused to do, and, as it could not be preserved and must come to an end by a sale under the power in the trust deed, no reason is perceived why appellants might not become the purchasers at the sale. They were under no moral or legal obligation to advance their own means, pay the debt, and preserve the property for the use of the other shareholders, who had declined to join in making pro rata advances to relieve it from debt. Appellants seem to have acted fairly, as they purchased at a sum sufficient to pay all the debts of the company. They chose to do so rather than make an effort to obtain all the property for the debts secured by the trust deed and the certificate of purchase. On the contrary, they gave many thousand dollars more, that honest creditors might be fairly paid, and the company wrong no one. This does not have the appearance of fraud. Appellants had faith that the enterprise could be carried out with success, and that they could thus save the means they had advanced; but appellees, by the course they adopted, manifested an entire want of confidence in its ultimate success. They were even offered the opportunity to come in for a considerable period afterwards, and share in the new enterprise, by advancing a ratable portion of the means, but they all declined;

but, when success was achieved, they then saw the advantages they had lost, and then sought to set aside the sale, and have the property restored to the old company, and thus reap the benefits arising from the enterprise and means advanced by others. To do so, they should show fraud or a want of power to make the sale or the purchase by appellants, neither of which has been done."

See, also, Leavenworth Co. Com'rs v. Chicago, R. I. & P. R. Co., 134 U. S. 688, 707, 10 Sup. Ct. 708; Osborne's Adm'x v. Monks (Ky.) 21 S. W. 101; Kitchen v. Railroad Co., 69 Mo. 224; Oil Co. v. Marbury, supra; Appeal of Shaaber (Pa. Sup.) 17 Atl. 209; Spering's Appeal, 71 Pa. St. 20; Bristol v. Scranton, 57 Fed. 70; Barr v. Plate-Glass Co., 6 C. C. A. 260, 57 Fed. 86, 97.

Complainants' bill should be dismissed, and judgment entered in favor of respondents for their costs. It is so ordered.